**RAUDENBUSH v. BALTIMORE & O. R. CO.**

No. 9146.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 6, 1946.

Decided Feb. 19, 1947.

B. Nathaniel Richter, of Philadelphia, Pa. (Richter, Lord & Farage, of Philadelphia, Pa., on the brief), for appellant.

Howard .Burtt, of Philadelphia, Pa. (Guckes, Shrader and Burtt, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS and McLAUGHLIN, Circuit Judges, and RODNEY, District Judge.

RODNEY, District Judge.

Valentine Raudenbush suffered fatal injury while taking part in a shifting operation in defendant's yard in Philadelphia on the night of February 2, 1944. This action was brought by his wife, as administratrix, to recover damages for his death under the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., the Safety Appliance Acts, 45 U.S.C.A. §§ 1–16, and the Boiler Inspection Act, 45 U.S.C.A. §§ 22, 23.

The decedent was serving as brakeman of a yard crew. The crew began work at 10:30 in the evening, about an hour after a light snow had stopped falling. In the yard there were, among others, five freight cars on track Short 29 and nine cars with a yard engine coupled to their eastern end on track 12 Lead, and all of these cars had at least a light covering of snow.

The conductor, who was in charge of the crew, was instructed to run around the nine cars with the yard engine, shove the nine cars in on Short 29, couple them to the five cars already there, and to lay there and wait for train 97 to come from the piers. To "lay there" meant to leave the engine coupled to the cars. With the exception of the engineer, who worked solely by hand signals from the other members of the crew, and the fireman, the entire crew was familiar with the instructions as given to the conductor. The decedent was specifically instructed by the conductor as to the nature of the move.

The crew proceeded to carry out the instructions. It was dark, as the yard had no system for general overall lighting and the engine headlight was off. The yard engine was run around to the western end of the nine cars and coupled to the westernmost car, which was a gondola, and the nine cars were then pushed eastward and coupled to the five cars on Short 29. At this point, with all fourteen cars coupled and motionless and with the engine facing them and coupled to the gondola, which was the last car on the western end of the fourteen, the decedent gave the engineer the slack signal for the purpose of enabling the decedent to pull the coupling pin and cut the engine from the cars. This action seems to have originated with the deceased and was not covered by any instructions. The engineer gave him slack and the pin was pulled. The engine was then backed about fifteen feet and stopped. The decedent, Raudenbush, was not hurt in the uncoupling.

The cars, almost immediately after the engine was cut from them, started to roll slowly to the east down a slight incline in the tracks. The conductor, seeing this, shouted to the engineer to couple up again. The engineer then turned on the engine headlight for the first time and started the engine moving slowly toward the cars.

Meanwhile the conductor was walking toward the moving cars near the engine. He had seen a form go up over, reach and grab for the gondola on its eastern end— next to the second car—and realized that the form was Raudenbush. The next time he saw Raudenbush, the latter's body was being rolled between the wheels of the gon-

dola. The conductor immediately gave the engineer the stop signal, and the engine came to a halt. It never got within more than two car lengths of the western end of the gondola. Finally the gondola passed the body of Raudenbush and stopped, and he lay in the middle of the tracks between the engine and the gondola, about a car length and a half from the engine and a car length from the gondola. Hence, the engine at no time touched him. He was taken to the hospital where he died shortly afterwards.

An examination of the gondola after the accident showed a slip-mark or skid-mark in the snow on the brake sill. It was thus inferred that Raudenbush had run eastward to the eastern end of the gondola, climbed up on the gondola, had slipped while attempting to apply the brake of the gondola and had fallen between the cars.

The jury was charged with returning a verdict for the plaintiff if it found either of two sets of facts: (1) that the defendant was negligent in failing to remove the ice or snow from the gondola and that the presence of ice or snow was the proximate cause of the accident, or (2) that the engine headlight should have been on when the cars started rolling and that the failure to have it on was the proximate cause of the accident. These two sets of facts were to be considered in relation to the defendant's duty under the Federal Employers' Liability Act to use reasonable care in providing its employees with a safe place to work. The Safety Appliance Acts and the Boiler Inspection Act were declared by the judge to be out of the case.

The jury below returned a verdict in favor of the plaintiff, but the trial court granted defendant's motion to set aside the verdict and judgment thereon and entered judgment for defendant in accordance with his prior motion for a directed verdict, under Rule 50(b) of the Federal Rules of Civil

Procedure, 28 U.S.C.A. following section 723c.

The case comes before this court on an appeal by plaintiff.

For clarity of reasoning we transpose the contentions of the appellant and treat them in the following order:

1. Was the railroad company guilty of a violation of the Safety Appliance Act in failing to make the sill of the gondola car "secure" by reason of its failure to remove any ice or snow therefrom?

2. Without regard to the Safety Appliance Act, was the railroad company guilty of negligence in failing to remove any ice or snow which might have been upon the sill of the car?

3. Was the railroad company guilty of negligence in failing to maintain the headlights on the locomotive at the time of the accident,

(a) as a violation of Rule 131 of the Interstate Commerce Commission as promulgated pursuant to statutory authority?[1]

(b) as an element of the duty to maintain a reasonably safe place to work?

4. Was the railroad company guilty of negligence in failing to furnish a reasonably safe place to work by reason of the inadequacy of the general lighting of the yard?

1. Was the railroad company guilty of a violation of the Safety Appliance Act in failing to make the sill of the gondola car "secure" by reason of its failure to remove any ice or snow therefrom?

Section 2 of the Safety Appliance Act of April 14, 1910, 45 U.S.C.A. § 11, requires that all cars subject to the provisions of the Act " * * * must be equipped with secure sill steps and efficient hand brakes * * *".

The appellant seeks to construe the word "secure" as requiring the railroad company

---

[1] "Each locomotive used in yard service between sunset and sunrise shall have two lights, one located on the front of the locomotive and one in the rear, each of which shall enable a person in the cab of the locomotive under the conditions, including visual capacity, set forth in Rule 129, to see a dark object such as there described for a distance of at least 300 feet ahead and in front of such headlight; and such headlight must be maintained in good condition." 49 C. F. R. Sec. 91.131.

to maintain the sill of the car free from a light fall of snow deposited thereon. "Secure," says the appellant, "means solid, non-slipping, non-shaky, not bent or unlevel. It means safe to stand on, a place where a brakeman may stand in security."

The appellant, in seeking to impose liability upon the railroad company, argues as if the statutory liability was to maintain a "secure sill." The language of the Act seems to require a "secure sill step" rather than the sill itself, but we pass this question to give specific attention to the meaning of the word "secure."

The appellant seeks to rely upon Lilly v. Grand Trunk Western R. Co., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411. There a workman was injured by slipping on ice which had accumulated on the top of a tender attached to a locomotive. Rule 153 of the Interstate Commerce Commission, promulgated under the Boiler Inspection Act, specifically required that the "top of tender behind fuel space shall be kept clean and means provided to carry off waste water." The Boiler Inspection Act required that equipment be maintained so as to be employed "without unnecessary peril to life or limb." 45 U.S.C.A. § 23. The court held that, considering both the statute and rule, a recovery under the Act could not be limited to those cases which were based upon defects in construction or mechanical operation. Because of the language of the rule involved in the cited case and of the reliance upon such language and of the absence of such language in the present case, we do not think the cited case dispositive of our present question.

In Tobin v. Detroit, Toledo & Ironton R. Co., 57 Ohio App. 306, 13 N.E.2d 739, the word "secure" as appearing in the precise statute as now before us was construed to refer only to the mechanical and structural character of the equipment and not to an accumulation of frost thereon.

It is significant that the same word "secure" is used as to the requirement for sill steps, ladders, running boards, handholds, and grab irons. In Ford v. New York, N. H. & H. R. Co., 2 Cir., 54 F.2d 342, the presence of grease on handholds did not render such handholds insecure so as to constitute a violation of the Act.

We think the presence, if such there was, of a slight fall of snow upon the sill of the car under the circumstances of this case did not constitute a violation of the Act insofar as related to the duty to maintain "secure" sill steps.

2. Without regard to the Safety Appliance Act, was the railroad company guilty of negligence in failing to remove any ice or snow which might have been upon the sill of the car?

The appellant insists that in order to furnish to the deceased a safe place to work it was the duty of the railroad company to remove the snow remaining on the sill of the car and that the failure to remove such snow constituted an act of negligence irrespective of the statute hereinbefore considered. This question must be briefly discussed.

In the charge the trial court left to the determination of the jury the question as to whether the railroad company was guilty of negligence in permitting the snow to remain. The trial judge in his opinion on the defendant's motion for judgment thought that the question of the railroad's duty to remove the snow should not have been submitted to the jury.

Since the existence or non-existence of this duty depends somewhat upon the facts, so these facts must be considered. The time was February 2d; it was not clearly proven that any ice was present; there had been a light snowfall and, in the words of a witness, there was "a very, very thin coating of snow." The snowfall had ceased an hour or hour and a half before the accident. While the number of cars or size of the yard does not appear from the evidence, the trial judge, from arguments of counsel or some other source, assumed there were some 930 cars in the yard.

It is a general rule of wide acceptation that since railroad companies have no control over the vagaries of the weather or climatic conditions that there is no liability for injuries resulting from the mere existence of ice or snow and disconnected from other circumstances. It is true, how-

ever, that a railroad company, like other employers, must furnish its employees a reasonably safe place to work. The phrase "reasonably safe place to work" is a term of relative application. It does not mean the absolute elimination of all dangers, but the elimination of those dangers which could be removed by the exercise of reasonable care on the part of the employer.

■ The place of work here was a switch yard. It is a place of moving cars and locomotives and no reason exists why, within the confines of such yard, the employer should not be required to exercise a reasonable degree of care to prevent an accumulation of snow or ice in such quantity and location as would constitute a menace to the safety of the employees in the performance of their various duties. The degree of care to be exercised by a party must have some reasonable relationship to the ability of that party upon whom the duty is cast to perform such duty. In this case we accept the statement of the learned judge that there were some 930 cars in the yard awaiting removal. The snowfall had ceased only an hour or hour and a half and had left a "very, very thin coating." While this case concerned the movements of only 14 cars, yet a somewhat similar duty would exist as to all other cars similarly situated.

In Gibson v. Iowa Central R. Co., 115 Minn. 147, 131 N.W. 1057, and Melody v. Des Moines Union R. Co., 161 Iowa 695, 141 N.W. 438, the courts considered the duty to remove ice or snow from switch yards. In those cases the snowfall was very considerable in quantity and allowed to remain for extended periods of time.

■ We do not think that under the facts of this case, and particularly in view of the recentness of the storm and slight nature of the snowfall, that any duty existed on the part of the railroad company to remove the light fall of snow from the area of the deceased's employment and think no verdict could be based upon the violation of such supposed duty.

3. Was the railroad company guilty of negligence in failing to maintain the headlights on the locomotive at the time of the accident, (a) as a violation of Rule 131 of the Interstate Commerce Commission as promulgated by statutory authority?

■■ Rule 131 of the Interstate Commerce Commission as hereinbefore set out in footnote 1 requires each locomotive "used" in yard service between sunset and sunrise to have head and rear lights of a stipulated power and capacity. The rule under the Boiler Inspection Act, 45 U.S. C.A. § 28, has the force of law and we must consider its application and meaning.

The court below, both in its charge and in its opinion on the defendant's motion for judgment, held that the rule was not applicable to the present case because at the time the cars started drifting the locomotive had been uncoupled and had moved back some fifteen feet and was not "in use" or, as stated in the opinion on the motion for judgment, was neither "in motion or in use."

The appellant argues that the mere fact that the locomotive at the time of the accident was not in motion is irrelevant to the question as to whether or not such locomotive was being "used" within the meaning of the Rule. So seem the authorities. In Chicago G. W. R. Co. v. Schendel, 267 U.S. 287, 45 S.Ct. 303, 69 L.Ed. 614, a motionless and disabled car was held to be "in use" (under the Safety Appliance Act) when it was on a siding to be cut out and left so that the other cars could continue the journey. In Minneapolis, etc. Ry. Co. v. Goneau, 269 U.S. 406, 46 S.Ct. 129, 70 L.Ed. 335, a motionless car was likewise held to be in use while still in a section of the train. See also Cusson v. Canadian Pac. Ry. Co., 2 Cir., 115 F.2d 430, and Fort Street Union Depot Co. v. Hillen, 6 Cir., 119 F.2d 307. Under the above authorities the fourteen cars involved in the present case must be held to be "in use" even though motionless. If the locomotive had remained attached to the cars it would be incongruous to hold under the above authorities that the cars were "in use" though not in motion and that the locomotive with said cars was not being "used" merely because it was stationary.

Did the locomotive cease to be "used" because it was uncoupled and moved some fifteen feet away from the cars?

Concededly the requirement that lights capable of disclosing objects at a distance of 300 feet be maintained by locomotives "used in yard service" must be reasonably considered. It might be argued as irrational to hold that such lights were required where the locomotive was to be uncoupled and moved to a distant point and to be entirely inactive for a long period of time. We have no such facts. Here there was an interval of but a few seconds or minutes between the active use of the locomotive and the time of the accident. The locomotive was only some fifteen feet from the cars with which it had just been used and with which it was to be used again at an undetermined time when the other cars arrived, but which arrival was certainly expected. The engineer was still in the locomotive cab and the other crew members were in the immediate vicinity of the cars. The act of uncoupling was brought about by the signal of the deceased himself and was not expressly covered by his instuctions so that insofar as the defendant's instructions were concerned the locomotive was to remain in use. We think the locomotive was being used in yard service within the meaning of the Rule. The court below, in its opinion on defendant's motion for judgment, thought that, in any event, the failure to have lights upon the locomotive should not have been submitted to the jury for the reason that the failure to maintain such lights was not the proximate cause of the accident. This question will be subsequently considered.

3. Was the railroad company guilty of negligence in failing to maintain the headlights on the locomotive at the time of the accident, (b) as an element of the duty to maintain a reasonably safe place to work?

This precise question was left, by the charge of the court, to the jury. Upon this, and other matters submitted to them, the jury found a general verdict for the plaintiff. The court below was of the opinion that the failure to have the lights could not have been a proximate cause of the accident and should not have been submitted to the jury. The court reasoned that the purpose of the lights was to enable the engineer to see and of warning others of the approach of the engine or train. The court then concluded that since neither the engine nor engineer were at all concerned in the accident and the deceased clearly knew of the presence and movement of the cars that the absence of lights upon the locomotive was not a proximate cause of the accident.

We cannot say that it was the duty of the company to have the lights on as an element of the duty to furnish the deceased with a safe place to work. We cannot pick out those particular lights and determine that in order to furnish a reasonably safe place to work those particular lights should have been maintained. We do say, however, that if it was the duty of the railroad company to have the headlights on (and we think under the quoted Rule that such duty existed) that then the question as to whether the failure to have such lights constituted a proximate cause of the accident was, under the facts of this case, solely for the jury. In Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 578, 65 S.Ct. 421, 89 L.Ed. 465, the court held that in an appropriate case the fact that the direct rays from the lights would be blocked was immaterial and that diffused rays might be sufficient. In the present case the accident happened in connection with a gondola car nearest the engine and the lights of the engine were sufficiently high to shine over the car. The car was a portion of the train in use with the engine and it was the independent movement of the cars that caused the accident.

We cannot say that the presence or absence of the light was devoid of significance with reference to the ability of the deceased to see both the movement of the cars or the presence of any snow or other object making more perilous his action in stopping the cars. Such questions should be determined by a jury.

4. Was the railroad company guilty of negligence in failing to furnish a reasonably safe place to work by reason of the inadequacy of the general lighting of the yard?

The appellant in his brief in this court argues as if this question is now before this

court. This fact is not entirely clear. In the complaint reliance was had upon a general "failure to provide the deceased with a safe place to work." In the evidence there is only a slight reference to the general lighting and no evidence whatever of the size of the yard or other criterion or standard by which the adequacy of the general lighting could be tested. In the appellant's points for charge reference was made to the failure to provide "adequate lights" with no indication as to whether the failure of lights referred to the general lighting of the yard or to the headlights of the locomotive.

In the charge the trial judge made no reference to the general lighting of the yard and only considered the feature of lighting in connection with the lights on the locomotive and no mention of general lighting was made in the opinion on the defendant's motion for judgment. The brief of the appellee does not discuss the question of general lighting of the yard at all.

We do not continue the discussion because the general lighting was not concerned in the judgment herein appealed from and because of the conclusion on another ground herein reached by us.

A difficulty with this case arises from these circumstances. The plaintiff relied upon the following allegations of negligence:

1. Violation of a duty to maintain headlights on the locomotive under Rule 131 of the Interstate Commerce Commission as promulgated by statutory authority.

2. Violation of duty to maintain a "secure" sill on car.

3. Violation of duty to maintain headlights on locomotive as an element of furnishing a reasonably safe place to work.

4. Violation of duty to remove snow from cars involved in accident.

The court in its charge rejected the plaintiff's contentions as to points 1 and 2, but left to the jury questions arising under 3 and 4. After a verdict for plaintiff the defendant under Rule 50(b) of the Rules of Civil Procedure[2] moved to have the verdict and judgment thereon set aside and to have judgment entered on his prior motion for a directed verdict. No motion for a new trial was joined therewith.

The court below thought that it had erred in submitting questions under points 3 and 4 to the jury and reiterated its view that there was no jury question under point 1. We think the court was correct in its conclusion as to points 3 and 4 but differ as to point 1. It is here that an anomalous situation is presented.

We think that where a trial court submits a case to a jury on a ground of negligence which does not impose a liability on the defendant but the pleadings and evidence make a case for the jury on grounds which the court refused to submit to the jury, the defendant, after verdict for plaintiff, may be entitled to a new trial, but is not entitled to a judgment in accordance with his prior motion for a directed verdict. Koski v. Chicago M. & St. P. Ry. Co., 116 Minn. 137, 133 N.W. 790; Herman v. Wabash Ry. Co., 153 Minn. 195, 189 N.W. 934; Olson v. Buskey, 220 Minn. 155, 19 N.W.2d 57.

The judgment for the defendant must be reversed. The effect of this reversal cannot be to reinstate the verdict of the jury for the plaintiff and the judgment entered thereon because all of the grounds submitted to the jury and upon which the verdict and judgment for the plaintiff had been based have been found improperly submitted to the jury. The judgment for the defendant must be reversed with a new trial to be accorded in accordance with this opinion.

[2] A valuable annotation on this Rule is found in the Lawyers' Edition of report of Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, at page 155.