**FUGAZZI**

v.

**SOUTHERN PAC. CO.**

No. 13414.

United States Court of Appeals,
Ninth Circuit.

Nov. 19, 1953.

Rehearing Denied Dec. 23, 1953.

John F. Moran, Leo Fried, James A. Himmel, San Francisco, Cal., for appellant.

Horace B. Wulff, Sacramento, Cal., Devlin, Diepenbrock & Wulff, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and McCORMICK and GOODMAN, District Judges.

DENMAN, Chief Judge.

Fugazzi appeals from a judgment notwithstanding the verdict setting aside a judgment in his favor for $8,575.00 for personal injuries received while in the employ of the Southern Pacific as car repairman in the Company's yard at Stockton, California. The court had denied the Southern Pacific's motion for a directed verdict and the question here is, was the court right in denying that motion or right in granting the motion to set aside the judgment.

The complaint alleged that the Company's employee had caused Fugazzi to work in a place known to the Employer to be unsafe and as a result of so working he was injured. It was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, providing that the railway is liable to its employee for "injury * * * *resulting in whole or in part* from the negligence of any of the * * * employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars * * * appliances * * * or other equipment." (Emphasis supplied.) The company is liable for its negligence regardless of the employee's assumption of his risk in working in a negligently kept place of employment, 45 U.S.C.A. § 54, and his contributory negligence does no more than reduce his amount of damage, 45 U.S.C.A. § 53.

The parties are agreed that Fugazzi's injuries occurred from causes arising at the place he was ordered to work. This was on a line of three boards running lengthwise on the middle of the top of a freight car whose roof sloped downward on each side of the boards. Each board was 5½ inches wide with 1½ inch distance between the outer boards and the inner boards, that is, the width of the three boards is 19½ inches. It is further agreed that the sloping roof surrounding this 19½ inches of working space was covered with slippery ice.

The undisputed evidence is that Fugazzi was ordered to work on the car on which he was injured by a notice placed

on the side of the car on the afternoon before the accident. The notice stated that a running board needed repair. He went on the roof at 7:15 A. M. and walked on the running boards until he was alongside the defective one. He had his chisel in one hand, his hammer in the other and stood on the running board which was rotting with his back to the icy roof. He reached down and grasped the rotting edge of the board and pulled hard enough for a piece of the board a foot long and an inch wide to give way and to balance himself he stepped back on the icy roof and slipped and fell 11 feet 10 inches to the hard macadamized ground beside the car. At the hearing it was admitted that this step on the icy roof because the rotten piece gave way was "inadvertent." Under the Act we are not concerned with acts constituting negligence which contributed to the slippery condition of the ice in causing his fall, for if they were, that was a matter for the jury's consideration in mitigation of damages. It is certain that his fall was not by his deliberate as distinguished from inadvertent action.

From the above facts the jury could have inferred that the place at which he was ordered to work was an unsafe one. In addition, it was admitted by the Company's witness, the foreman under whom Fugazzi worked, that the ice made an unsafe hazard to the workman.[1] This testimony by the Company's witness was to rebut the undisputed testimony that other railways protected their workmen on the running boards surrounded by icy roofs by putting sand or salt on the ice.

Clearly the jury could draw the inference that this foreman's excuse for not salting or sanding it was sheer nonsense, because the weather conditions on all the preceding days and on that day showed the ice would have melted during the day and the sand or salt swept off or hosed off before the car was joined to a train. The jury well could have disbelieved his testimony that the icy-roofed car was a safe place to work and accepted the contrary testimony of witness Wise.

Contradicting the foreman's testimony concerning safety of the icy roof and the duty of the Company when icy condition of car tops exists is the following testimony given by the expert witness, Mr. Wayne E. Wise of the Brotherhood of Railway Carmen of America and Chairman of the Joint Protective Board of the defendant Company and its affiliated lines. Wise was an experienced car repairman. He said that part of his duties as local Chairman is in connection with safety working conditions. That as General Chairman his jurisdiction extends from Portland, Oregon to Los Angeles, California, and that he makes personal trips and job studies in those places. When a man has to repair a walk on the roof (limiting the question to situations when cars have icy roofs on them), the best practice when a man is repairing a walk on top (the witness when conducting the survey) found that the icy conditions are best overcome by the use of salt or sand sprinkled on the roof of icy cars. That from his experience that he had observed of cars that were placed in the shop—he was speaking now of boxcars with tin roofs that were placed in the shop overnight—ice could not accumulate.

On cross-examination by counsel for defendant the witness testified in substance that when he spoke about using salt and sand, he would put that on top of the car, when it had a glazed ice condition. Obviously the jury could infer that without sand or salt the place Fu-

1. "Q. Now, is it your practice to put salt and sand on icy roofs while the cars are on the rip track? A. No, sir.

"Q. Why not?

    *        *        *        *        *

"The Witness: It is unsafe to trainmen that have to handle salt—or sand; it is a very unsafe condition. When the car starts moving out again, trainmen have their heads out the windows of the cabs to make inspections, the sand will fly back and get in their eyes. That will cause a hazard just the same as the ice conditions by rolling under feet." (Emphasis supplied.)

gazzi was ordered to work in was unsafe.

This witness further testified that Rule 49–A of the Motive Power and Car Departments agreement between the defendant and the System Federation No. 114, Railway Employees' Department, American Federation of Labor, Mechanical Section thereof, dated effective April 16, 1942, was in force and effect on February 8, 1950.

This was the date of plaintiff's accident. The rule reads as follows:

"Employees will not be required to work on engines or cars outside of shops during inclement weather, if shop room or pits are available."

It is not questioned that shop room was available for this car during this cold night. More important still for the jury's inferences of the Company's negligence and as to whether such an icy place was a safe one to work in is General Chairman Wise's testimony that the likelihood of icy conditions *should be thought of in advance.* He said:

"Q. It is necessary for the *company to have notice* that there is an icy condition on the top of the car before that method can be pursued? A. I would say no to that.

"Q. You could do that without notice? A. That is right, maybe.

"Q. What do you mean by that, sir? A. Because where there are icy conditions those safeguards should be thought of in advance." (Emphasis supplied.)

With this criterion of such an experienced witness, the jury had the following evidence of the "icy conditions" prevailing in the Stockton yards in the preceding three weeks and on the morning of February 8, 1950, at 7:15 A. M. when Fugazzi was injured.

The undisputed evidence is that when the Company's foreman came to work in the Stockton yard at 6:30 A. M. on February 8, there was ice formed on the ground in the neighborhood of the car. At that time of the year frost and ice were common in that Stockton yard. At 2:29 A. M. on February 8 ground fog began to gather and at 4:28 A. M. it was so dense it obscured the sky completely with a visibility as low as ¹⁄₁₆, that is, "dense fog." This continued until 9:24 A. M., long after the accident. This ice on the car top was formed by a temperature record of that morning of not less than 32 degrees. The undisputed further evidence is that between January 23 and February 8 there had been nine nights of sub-freezing temperatures successively of the following degrees, all but one much lower than on February 8: 29, 27, 28, 25, 32, 30, 29, 26 and 24. Fugazzi's foreman worked in the repair yard in the mornings succeeding all these low temperatures. The jury well could infer that he or other foremen must have known of these cold nights and the ice on the ground and should have known the likelihood that the roof on the morning of February 8 could have slippery ice or frost formed on it from the freezing or frosting of the dense fog wetting it—, that is to say, as stated by Wise, the prior icy conditions required that the safeguards of salt or sand should be prepared for in advance and Fugazzi not allowed to work without such preparation.

We think the District Court was right when it denied the defendant's motion for an instructed verdict and erred when it ignored the testimony of Wise and the admission of the foreman and found that the icy roof was a safe place to work.

The judgment setting aside the judgment in favor of Fugazzi is reversed and the judgment in his favor is upheld.

GOODMAN, District Judge (dissenting).

I dissent.

In my opinion the District Judge was right in entering judgment for the defendant notwithstanding the verdict for the plaintiff. A careful examination of the record fails to reveal *any evidence at all* of any negligence of the defendant causing, in whole or in part, the unfor-

tunate injuries to the plaintiff. And up to the date of this writing, such evidence is still a legal requirement for a recovery under the Federal Employers' Liability Act. I say this because, after presiding as District Judge in almost one hundred F.E.L.A. cases, it has become evident to me that the Act is steadily being converted into a compensation statute. It has been said that the F.E.L.A. is now "a form of enterprise liability, approaching a state of negligence *without fault.*"[1] Along with many judges, I believe that there *should be* a Federal Compensation statute for railroad employees and seamen.[2] But so long as we have the present law, our duty is to follow it. This the trial judge did.

The record shows that the defendant railroad company maintained, at Stockton, California, a yard wherein trains are made up and light repairs made thereon. Freight cars coming into the Stockton yard enroute to other points, are inspected by car inspectors for defects. If defects are found, the car is tagged with a "bad order" card describing the defect. On February 7, 1950, a New York Central freight car came into the rip track in the Stockton yard and was inspected. It was found that two of the boards making up the running board on top of the car were defective. A "bad order" card to that effect was placed on the car by the inspector. The next morning, on February 8, at the beginning of the morning shift at 7 o'clock a.m., the plaintiff, an experienced car repairer, in the performance of his duties, saw the bad order card, and went up on top of the car to make the repairs. The

running board was approximately 19½ inches wide and was level. On each side sloping downward was the metal roof of the car. The running board is a safety device required by the rules and regulations of the Interstate Commerce Commission pursuant to the Safety Appliance Act, 45 U.S.C.A. § 1 et seq., to be kept in good condition for the safety of the men working on or operating the cars. The purpose of the inspection was to remedy conditions that would be dangerous to the men required to perform work on the top of the car.

Before commencing his repair work, plaintiff observed a coating of ice upon the metal roof, not over all the roof, but adjacent to the place where the repairs to the running board were required to be made. During the early hours of the morning of February 8th the temperature dropped to and remained for a short time at 32°, thus apparently causing a slippery icy or frosty surface to form on the metal roof. A heavy fog had provided the moisture. By 9:30 a.m. the temperature had risen above freezing point. Similar temperatures had occurred on a few mornings prior to February 8th.

The evidence is undisputed that the running board itself was a perfectly safe place for the plaintiff to work, for it was not slippery and had no moisture or frost or ice on it. The plaintiff himself so stated. The plaintiff stepped off the running board and on to the roof in attempting to remove the defective board. As a result, he slipped down the roof and was precipitated to the ground.

1. Pollack, Law & Contemporary Problems, 1953, Vol. 18, No. 3, p. 296 et seq. This article was written just four years after the Supreme Court made a special point of disclaiming that any of its prior decisions had weakened the Act's requirements. Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497.

2. The F.E.L.A. was enacted in 1908, before any State Workmen's Compensation Acts had been adopted in the United States. But they followed rapidly thereafter. California enacted its Compensation Act in 1911 and, by 1918, 37 states followed suit. So it is not unfair to say that the Federal Government, while first in the field, has now become laggard in what is generally regarded as a great social welfare achievement. There is some criticism that compensation rates are too low under some state statutes. But no one can say that the Compensation statutes have not accomplished good for the greatest number.

It is upon these facts that the majority says: "the jury could have *inferred* that the place at which he was ordered to work was an unsafe one." It is not clear how such an inference could be drawn without evidence of the violation of some duty owed to plaintiff by the railroad company.

The evidence showed that the running board was a perfectly safe place to work. Plaintiff chose not to use it, but instead pursued the obviously unsafe course of attempting to do the work while standing on the sloping metal roof, *which he had just observed was icy.*

From what *facts* could the jury infer an unsafe place to work? If we have finally reached the point where "negligence without fault" is the standard, then, of course, trial and appellate judges can bestow their blessing upon such inference-drawing.

The trial judge's statement, in his memorandum opinion granting judgment for the defendant notwithstanding the verdict, that—"plaintiff adopted a method foolhardy under the conditions apparent to him and carelessly neglected to follow a course which would readily appear to anyone, even the unexperienced, to be safe. As plaintiff attested, and readily admitted, he made a foolish mistake,"—is obviously a correct conclusion upon the record.

The negligence charged to the defendant was that it failed to provide the plaintiff with a reasonably safe place in which to work. It is bromidic, but it must be repeated, that negligence is not an absolute term, but is relative. As juries are frequently instructed, it relates to time, place and circumstance. So it is that the requirement of a reasonably safe place to work is likewise a relative term; it likewise is a duty that must be related to time, place and circumstance. What may be a safe place in which to work at one time under certain circumstances, may be unsafe at another time and under different circumstances. Indeed even the *same* place might be a safe place to work at *one* time and *unsafe* at another, depending upon the circumstances.

There is not a single bit of evidence of any kind in this case to indicate that the running board upon which plaintiff could perform his functions was not a safe place to work. The claim is made, and the majority of the court sustains it, that the safe running board became unsafe because some other place which plaintiff knew was unsafe, was used by him to perform his work.

This claim is presented in a two-fold posture. First, that there was a duty resting *at the time* on defendant to put sand or salt on the sloping car roof and, second, that there was a duty at the time, according to a rule, to put the car in a shop under cover so that the roof would not get icy. In neither aspect is there any evidence at all to support the claims made.

First. It must be admitted that the defendant did not cause the sloping metal roof to become icy. Nature was responsible. No one knew of this condition, *until plaintiff saw it.*

The majority says there was some duty resting upon defendant, not particularly described, to do something about it and quotes the broad airy opinion of a witness that "where there are icy conditions, those safeguards should be thought of in advance." The witness was saying that in his opinion the railroad *wherever there are icy conditions, should put sand or salt on the ice.* But when and where and under what conditions?[3] The only evidence in that re-

3. Dangerous working conditions caused by temporary inclement weather do not create a duty, so as to make a violation thereof an act of negligence. Missouri Pacific Railroad Co. v. Aeby, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351; McGiv-ern v. Northern Pac. Ry. Co., 8 Cir., 1942, 132 F.2d 213; Raudenbush v. Baltimore & O. R. Co., 3 Cir., 1947, 160 F.2d 363; Detroit T. & I. R. Co. v. Banning, 6 Cir., 1949, 173 F.2d 752.

gard was the testimony of a witness that between 1924 and 1932, he worked in Illinois and Iowa for railroads who put sand on the roofs of icy freight cars. But to compare the winter conditions, over twenty years ago, of Illinois and Iowa, in zero or even sub-zero temperatures, with accompanying sleet and snow, with conditions at Stockton, California, in 1950, where snow and ice are unheard of, makes a Californian shudder. It is this testimony that the Court describes as "the undisputed testimony that other railways protected their workmen * * * by putting sand or salt on the ice."

To say that sprinkling sand on a sloping icy metal roof would be a safeguard and prevent slipping, once one steps on the roof, seems to me to be the sheerest "nonsense." Of course, it might be a duty under specified circumstances, to place sand on an icy surface, where men are *required to walk*. But first it must be shown that men are required to walk on it and then that the location is such that putting sand on it would prevent slipping. Common sense, as one witness said, would prompt the conclusion that putting loose sand on a sloping icy surface would cause, rather than prevent, slipping. Another witness said that sand was not used because it would do no good, but in fact would create a hazard to trainmen when the train was in movement.[4] But irrespective of anyone's opinion, there was *no evidence* that it would do any good under the circumstances of this case. Evidence that it was not done is not sufficient to show

that the doing of it would be necessary for safety.

Second. Rule 49(a), referred to in the majority opinion, provides: "Employees will not be required to work on engines or cars outside of shops during inclement weather, *if shop room or pits are available.*"

The majority state that it is "not questioned that shop room was available for this car during this cold night." Hence, it is asserted, the company violated the rule and was guilty of negligence. But I must respectfully, but nevertheless firmly, point out that the evidence shows that there was *no shop room at* Stockton. The witness, upon whom the court apparently relies for the above statement, was referring to Sacramento[5] not Stockton. The record shows that cars had to be repaired in the open at Stockton yard. Hence Rule 49(a) had no relevance whatever.

The trial judge stated: "It appears conclusively to me that a reasonably safe place and method of doing the work was afforded and that the plaintiff's injuries resulted from his own deliberate or careless act,[6] not from any actionable fault of the defendant. This conclusion of the able and experienced trial judge appears to me to be the only conclusion that could be reached upon the record before him. Speculation, surmise, and conjecture as to what should or should not be a safe place to work is never a function of a trial jury. Much less should it be that of a reviewing court. The judgment of the District Judge, in my opinion, was correct and should be affirmed.

4. In the majority opinion, it is urged that the jury could have disbelieved such testimony and thus inferred that the place of working was unsafe.
But that is mere speculation and cannot supply the place of proof. Moore v. Chesapeake & O. Ry. Co., 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547; Bunt v. Sierra Butte Gold M. Co., 138 U.S. 483, 11 S.Ct. 464, 34 L.Ed. 1031; Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232. 88 L.Ed. 239.

5. Tr. pp. 133–138, particularly pp. 133 and 138.
(I see no purpose in quoting, in extenso, the testimony I have referred to.)

6. Even assuming a duty to do something about the ice, plaintiff, being the first to know of the slippery icy condition, and doing nothing about it, was himself the cause of the accident. McGivern v. Northern Pac. Ry. Co. supra.