Eugene J. **WHELAN**, Plaintiff-Appellee,

v.

**PENN CENTRAL COMPANY,** now known as Penn Central Transportation Co., Defendant-Appellant and Third-Party Plaintiff-Appellee-Appellant,

v.

The **UNITED STATES** of America, Third-Party Defendant-Appellant-Appellee and Fourth-Party Plaintiff-Appellee,

v.

The **FEDERAL STORAGE WARE-HOUSE,** Fourth-Party Defendant-Appellant.

Nos. 1122–1125, Dockets 73–2789, 74–1338, 74–1367, 74–1417.

United States Court of Appeals, Second Circuit.

Argued June 17, 1974.

Decided Sept. 11, 1974.

Mansfield, Circuit Judge, dissented and filed opinion.

David J. Mountan, Jr., New York City (Conboy, Hewitt, O'Brien & Boardman, New York City, Thomas J. Smith, New York City, of counsel), for Penn Central Co.

John E. Trecartin, New York City (O'Hagan, Reilly & Trecartin, New York City), for Federal Storage Warehouse.

Taggart D. Adams, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Joseph P. Marro, Asst. U. S. Atty., of counsel), for United States.

Arnold B. Elkind, New York City (Donald E. Lampson, New York City, of counsel), for Eugene J. Whelan.

Before SMITH and MANSFIELD, Circuit Judges, and BARTELS, District Judge.[*]

J. JOSEPH SMITH, Circuit Judge:

These are appeals from judgment on a verdict entered November 8, 1973 after a jury trial in the United States District Court for the Southern District of New York, Thomas P. Greisa, *Judge,* awarding plaintiff-appellee Whelan $400,000 against defendant-appellant and third-party plaintiff-appellee Penn Central, and from judgments pursuant to a decision by Judge Greisa dated February 11, 1974, awarding Penn Central $200,000 against third-party defendant-appellant and fourth-party plaintiff-appellee United States of America, and awarding the United States $200,000 against fourth-party defendant-appellant Federal Storage Warehouse. We affirm in all respects.

On January 29, 1969, Eugene Whelan was working as a brakeman on a Penn Central engine crew which was engaged in a switching operation in the Raritan Arsenal, a facility in Edison, New Jersey, which is owned by the federal government. Light rain and sleet had been falling since early morning, and the temperature hovered around thirty degrees Fahrenheit. There was an icy glaze on the ground and on the equipment. At about mid-day, Whelan's crew was in the process of moving two freight cars from a siding to the upper yard of the Arsenal. As the engine with the two cars approached the junction of the lead track and the main track, Whelan started down the steps at the rear of the engine, intending to stop on the bottom step, signal the engineer to stop the engine, step off the engine onto the pavement adjacent the track after the train came to a halt, and throw the switch. As he came down the steps, the train was proceeding on a slight downgrade at about three miles per hour. His left foot slipped as it touched the bottom step, and so did his hands when he tried to break his fall by using the hand grabirons of the step assembly. When his feet touched the pavement, the train seemed to speed up somewhat. Whelan managed to take one to three steps sideways on the ground before losing his grip on the lower part of the grabiron. The pavement was icy and broken in the area where his feet landed. He slipped, tripped, fell to the ground, was hit and dragged a short distance by the freight car. As a result, he was seriously injured.

The jury found that Penn Central was liable to Whelan under the Boiler Inspection Act, 45 U.S.C. §§ 22–34, which provides, *inter alia,* that locomotives and "all parts and appurtenances thereof . . . [shall be] in proper condition and safe to operate in the service to which the same are put. . . ."[1] Sitting without a jury,

---

[*] Senior United States District Judge for the Eastern District of New York, sitting by designation.

1. 45 U.S.C. § 23. Section 23 reads in full:
   It shall be unlawful for any carrier to use or permit to be used on its lines any

Judge Greisa subsequently ruled that the accident was caused by the "joint or concurring negligence" of Penn Central and the United States Government in that the Government was obligated by agreement with Penn Central to maintain the pavement on which Whelan slipped and tripped. And, pursuant to that same agreement, judgment was entered against the federal government for one-half of the damages assessed against Penn Central, or $200,000. The court further found that Federal Storage Warehouse must indemnify the United States for that $200,000 judgment because the duty of maintaining the pavement in question had been delegated to Federal Storage Warehouse under an easement agreement between the United States and Federal Storage Warehouse. Penn Central appeals the jury verdict in favor of Whelan and the failure of the court below to award Penn Central full indemnification against the United States. The United States appeals the award of partial indemnification to Penn Central. Federal Storage appeals the $200,000 judgment against it. .

### A. *Whelan v. Penn Central*

■ Penn Central attacks the jury verdict on four grounds.

First, it contends that there was insufficient evidence to support the jury's finding that it violated the Boiler Inspection Act. The evidence, however, was substantial. On the morning of the day of the accident, the engineer described in his "Locomotive Inspection Report" defects in the right-side step assembly from which Whelan fell: "Rear step RS bent and small metal strip coming loose." Penn Central took no corrective measures between the time of the report and the

time of the accident. Furthermore, the step assembly (steps and grabirons) had been coated with ice for several hours prior to the accident. The engineer made a second, relevant entry: "Adjust excess brake piston travel." Engineer Johnson testified that the effect of "excess brake piston travel" is to reduce the effectiveness of the braking system. No adjustment was made prior to the accident. Penn Central conceded below that the condition of the brake violated the Act and argued that the condition was unrelated to the accident. But this is a matter for the jury. We will not disturb a Boiler Inspection Act verdict which has such an evidentiary basis, Bolan v. Lehigh Valley R. R., 167 F.2d 934 (2d Cir. 1948). The jury could well have found that the condition of the step assembly, by itself or in conjunction with the defective brake, was a cause of Whelan's fall.

■ We must therefore reject appellant's attack on the sufficiency of the evidence. We turn to its legal claim. Judge Greisa instructed the jury:

[U]nder the law the presence of foreign matter, such as ice, can give rise to liability under the Act. But, again, with respect to the ice as with respect to everything else, you are to apply the criterion of the statute and that is whether the steps by virtue of the ice or otherwise were made improper in their condition, were made unsafe to operate in such a manner as to create unnecessary peril to life or limb.

Penn Central contends that the Boiler Inspection Act is not violated by slippery conditions caused by the weather and that we must reverse the judgment because the icy condition of the step assembly clearly contributed to the accident and to the jury's decision. The ar-

---

locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, ten-

der, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28 to 30 and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.

gument has some force, but we conclude that we must reject it in light of prior case law.

In Lilly v. Grand Trunk Western R.R., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943), plaintiff fell from the top of a locomotive tender while attempting to lower a water spout. The top of the tender was icy, and plaintiff claimed that there was a small leak in the collar of the water manhole. The jury found a violation of the Boiler Inspection Act, while also finding in a special interrogatory that there was no leak. The Court, holding that the presence of ice on the tender top was sufficient to violate the Act, upheld the judgment, relying somewhat on a federal regulation which provided that the tender top be kept clean and means be provided to carry off waste water. The Court emphasized that the Boiler Inspection Act is to be construed liberally and concluded that the regulation ". . . only fortifies a result which we think the jury could probably have reached even in the absence of such a rule." 317 U.S. at 489, 63 S.Ct. at 352.

This court construed Lilly in Calabritto v. New York, New Haven & Hartford R. R., 287 F.2d 394 (2d Cir.), cert. denied, 366 U.S. 928, 81 S.Ct. 1649, 6 L. Ed.2d 387 (1961), where plaintiff slipped on sand and oil located on the platform of defendant's switching engines. Defendant argued that Lilly authorized recovery for nonstructural or nonmechanical defects only where the dangerous condition results from a violation of federal safety regulations. Although the court reached its decision with some reluctance, as is evident in the two concurring opinions, it held that Lilly must be read as holding that dangerous conditions caused by foreign substances may give rise to liability under the Act in the absence of such a violation.

Given this prior treatment of the Boiler Inspection Act, we must reject appellant's argument that its failure to violate a specific federal regulation immunizes it from liability on the basis of the icy condition of the step assembly. Appellant relies on a suggestion in Raudenbush v. Baltimore & O. R. R., 160 F.2d 363, 366 (3d Cir. 1947), to the effect that the violation of the regulation is an indispensable part of the holding in Lilly. To the extent that Raudenbush actually stands for this proposition and also represents the current position of the Third Circuit, both of which are questionable, Calabritto, 287 F.2d at 396, appellant's remedy is with a higher court.

Appellant's reliance on Turner v. Clinchfield R. R., 489 S.W.2d 257 (Ct. App., Tenn.1972), cert. denied, 411 U.S. 973, 93 S.Ct. 2168, 36 L.Ed.2d 696 (1973), is also misplaced. There, plaintiff slipped on ice which had fallen from the end of a tunnel onto the engine where plaintiff was working. The court held that the presence of this ice did not violate the Boiler Inspection Act because defendant could not have foreseen and therefore taken measures against this dangerous condition. Perhaps a railroad in Tennessee cannot be expected to guard against icicles falling onto engines en route. But a New Jersey railroad may well be held to a higher standard with respect to gradual ice formation in its own railyard. The icy condition in dispute in this case was foreseeable.

Today's decision is not necessarily the decision which Judge Friendly feared would be at the bottom of the slippery slope he identified in his concurrence in Calabritto, 287 F.2d at 397:

The language of the Boiler Inspection Act, 36 Stat. 913, § 2 (1911), 45 U.S.C.A. § 23, does not suggest to me a Congressional purpose to impose on railroads an absolute duty to keep the surfaces of locomotives and tenders as free from foreign matter at all times, as an operating room before surgery. If the Act does this, I see no way of limiting the requirement to such substances as oil and grease; it must extend also to substances as unavoidable in railroad operation as snow and ice. Such a construction means that rail-

roads face an inevitable conflict between the duty thus imposed, carrying the sanction of a $250 penalty for "each and every such violation," 45 U.S.C.A. § 34, as well as of liability to employees, and their duty to render reasonable service to passengers and shippers; if the New Haven chose to regard the former as paramount, there would, I fear, be many occasions during the New England winter when we would be bereft of the presence of our colleagues from Connecticut and Vermont.

Whelan worked the engines of the Raritan Arsenal, not the commuter trains. Perhaps neither ice nor rain nor heat nor gloom of night should stay the latter's course, but it may well be reasonable to curtail the Raritan Arsenal's *switching* operations temporarily—until some product of modern science or remedy of ancient prudence can be sprayed, spread or hooked up so as to alleviate the danger—where weather conditions make that work so obviously hazardous. The carrier in any case is in a better position than anyone else to balance the relative costs of meeting *Lilly's* strict demands and compensating an employee injured as was Whelan. *See,* G. Calabresi, The Costs of Accidents (1970). Moreover, it appears that ice alone did not cause Whelan's fall, and the charge taken as a whole could be interpreted as not having the matter turn on that factor alone. *Lilly* and *Calabritto* require that we affirm the judgment.

■■ Penn Central's two remaining arguments deserve less attention. It objects to the introduction into evidence of several photographs of plaintiff showing him in various stages of medical treatment. But the photographs are far from shocking and are tame indeed compared with the stark account Whelan

gave of his permanently disabled condition. They were properly admitted as relevant to the issue of pain and suffering. Finally, appellant challenges the lower court's decision to permit Whelan *to withdraw a Federal Employers' Liability Act claim* during the course of trial. Because appellant has not demonstrated that this decision was significantly prejudicial to its case, the action cannot be considered reversible error.

■ Appellee Whelan requests that we assess double costs and damages against Penn Central pursuant to 28 U. S.C. § 1912 and Rule 38 of the Federal Rules of Appellate Procedure. We deny this motion, as the appeal is far from frivolous.

## B. Penn Central v. United States

■ Penn Central's claim against the United States is based on paragraphs 3 and 9 of the Agreement for Industry Track dated February 1, 1962. In paragraph 3, the Government agreed to "maintain . . . repair . . . and renew . . . (including removal of ice, snow and debris) . . ." the pavement adjacent to the track where Whelan fell.[2] Paragraph 9 provides:

The Industry [the United States] also agrees to release, indemnify and hold harmless the Railroad, its officers, employees and agents, for loss, damage or injury from any act or omission of the Industry, its officers, employees and agents, to the person or property of the parties hereto and their officers, employees and agents, and to the person or property of any other person or corporation, while on or about the side track. If any claim or liability, other than from fire caused by locomotives as aforesaid, shall arise from the joint or concurring negligence of both parties hereto

2. We must reject the Government's argument that the duty specified in paragraph 3, to maintain the "side track," extends only to the running rails, ties and switch points of the railroad track and not to the pavement immediately adjacent to the track. The agreement defines "side track" as "track facilities . . . for the . . . conduct of the business of the Industry. . . ." Because the use of the pavement adjacent to the track was a necessary element of that conduct, "side track" must be read as including rails, ties, switch points and adjacent pavement.

it shall be borne by them equally. The Industry also agrees to release, indemnify and hold harmless the Railroad, its officers, employees and agents, for loss, damage or injury of any nature resulting from operation by the Railroad over the tracks of the Industry when such loss, damage or injury is due to any unsafe condition of the premises of the Industry.

The court below found that plaintiff's injury was caused by the "joint or concurring negligence" of Penn Central and the United States in that both the defective step assembly and the broken and slippery pavement caused the accident, and it awarded partial indemnity to Penn Central pursuant to the second sentence of paragraph 9.

The Government now contends that no indemnification was justified because, first, the court below erred in finding that its negligence contributed to the accident, and second, paragraph 9 does not govern. Penn Central argues that the court below should have awarded full, not partial indemnification because the third sentence of the paragraph is applicable, not the second.

The Government's first argument goes both to causation and to negligence. It challenges the findings below that it was negligent in permitting ice to accumulate on the pavement as well as in failing to repair breaks in the pavement and that the condition of the pavement was a proximate cause of the accident.

Citing McGivern v. Northern Pac. Ry., 132 F.2d 213 (8th Cir. 1942); Detroit T. & I. R. R. v. Banning, 173 F.2d 752 (6th Cir.), cert. denied, 338 U.S. 815, 70 S.Ct. 54, 94 L.Ed. 493 (1949), and *Raudenbush, supra,* the Government contends that the existence of recent ice conditions due to the weather does not violate its duty of care. These cases turn on facts and circumstances peculiar to each case; there is little to be learned from a string citation. The evidence here indicates that freezing rain had been falling for many hours prior to the accident and that the Government had some advance notice that a crew would be working at the scene of the accident. *Compare,* Skidmore v. Baltimore & O. R. R., 167 F.2d 54 (2d Cir.), cert. denied, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948), *with* Mirabile v. New York Cent. R. R., 230 F.2d 498 (2d Cir. 1956).

As to the break in the pavement, appellant characterizes it as a "small imperfection." But a photograph introduced into evidence reveals that it was a tripping hazard to alighting trainmen, and appellant clearly knew that trainmen would alight in the area of the switch.

■ The Government urges that we review the evidence unrestrained by the "clearly erroneous" test of Rule 52(a), citing Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2d Cir. 1969). But neither is *de novo* review the proper approach. As we have previously stated:

> The standard of review to be applied to a district court's finding of negligence is not the "clearly erroneous" standard . . . for a finding of negligence is reviewable as a matter of law. Nevertheless, the lower court finding "[will] ordinarily stand unless the [lower] court manifests an incorrect conception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009 (2 Cir. June 2, 1969), citing Radovich v. Cunard Steamship Co., 364 F.2d 149, 152 (2 Cir. 1966) and Esso Standard Oil, S.A. v. S. S. Gasbras Sul., 387 F. 2d 573 (2 Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

Hendry v. United States, 418 F.2d 774, 784 (2d Cir. 1969). *See also,* Dinnerstein v. United States, 486 F.2d 34 (2d Cir. 1973).

Here, we cannot say that the court below applied an incorrect legal standard. Neither can we perceive clear error.

■ The thrust of appellant's causation argument is that the court below improperly discounted Whelan's testimony at trial concerning what caused the accident. Whelan had testified that the

step assembly was the primary cause of the accident. Judge Greisa reasoned in his decision that Whelan's testimony was shaped to some extent by his withdrawal of the FELA claim against Penn Central for negligent maintenance of the pavement and that portions of the cross-examination had to be read with this in mind. We think that this is a proper inference for a trial court to draw. In any event, the court did not rely on this inference, and there was considerable evidence of the substantial role which the defective pavement played in the fall. Having digested all the evidence in this case, Judge Greisa stated in his decision:

> It seems to me inevitable that an icy pavement, broken in the way this pavement was, must have played a substantial part in preventing plaintiff from obtaining a footing and in propelling him underneath the box car.

We will not disturb this finding.

■ The remaining point in this appeal concerns the interpretation of paragraph 9. Penn Central claims that since the court below found that the accident was caused by an unsafe condition for which the Government was responsible, the third sentence of the paragraph applies. However, the Government's negligence was only *a* cause of the accident. Penn Central's interpretation of the paragraph would read the second sentence out of the agreement. Moreover, this is not a case in which a more specific provision in the contract conflicts with the joint or concurring negligence clause. *See* Anthony v. Louisiana & Arkansas Ry., 316 F.2d 858 (8th Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 74, 11 L.Ed.2d 61 (1963), and cases cited therein. On the most reasonable interpretation of the paragraph, the second sentence governs. *Anthony, supra,* at 866. *See also,* Northern Pac. Ry. v. Herman, 478 F.2d 1167 (9th Cir. 1973).

■ The Government contends that the paragraph only applies where liability arises from the negligence of the United States which is imputed to Penn Central. But the paragraph on its face is not so limited, and there is no evidence that the parties so intended to limit it. Had they so intended, they should have been more specific.

In short, we think the court below properly construed the agreement.

### C. *Federal Storage Warehouse v. United States*

An easement agreement between these parties dated July 11, 1967 allocated to Federal Storage Warehouse the duty of maintaining the pavement on which Whelan slipped and tripped.[3] The court below ruled that because Federal Storage Warehouse breached its duty to the Government to maintain the area, the Government is entitled to indemnity under § 95 of the Restatement of Restitution:

> Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other

---

3. Paragraph 3 of the easement agreement provides:

> The Grantee shall pay to the Grantor and its assigns, at such times as the Grantor or its assigns shall determine, its prorated share of the cost of maintenance and repair of the said railroad spur line, said cost to be allocated on the basis of the number of cars of each user using any portion of the railroad spur line from Woodbridge Avenue to a point approximately 1200 feet southerly therefrom, being the point where such spur connects with the track now or formerly owned and

recently installed by the Township of Edison. *The Grantee shall maintain and keep in repair the remaining portion of the spur line extending southward and easterly from the aforementioned point of connection with the Township's spur,* provided, however, that the Government and its assigns shall pay the Grantee a pro rata share of the cost of maintaining and repairing the said remainder of the spur line, based on the number of cars using the said remainder of the spur line for the benefit of each user.

or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition.

■■■■ Federal Storage Warehouse's primary point on appeal is that since the easement agreement contained no explicit indemnity provision, Federal Storage Warehouse cannot be held liable. Appellant relies on the tenets of construction that contracts of indemnity must set forth the indemnity provisions in clear and unequivocal terms, Mostyn v. Delaware, L. & W. R.R., 160 F.2d 15 (2d Cir.), cert. denied, 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355 (1947), and that any ambiguities in the easement agreement must be resolved against the United States, which drafted the document.

This argument mistakes the reasoning of the judgment below. Federal Storage Warehouse's liability is based on a theory of implied indemnity arising from its breach of the duty to maintain the pavement, not on an explicit indemnity agreement. That theory is sound. "[A]n agreement to maintain and repair carries with it an obligation to indemnify against breach thereof," Petty v. New York Cent. R.R., 322 F.Supp. 1324, 1327 (S.D.N.Y.1970), aff'd on opinion below, 438 F.2d 538 (2d Cir. 1971).

Appellant also contends that the Government actually maintained the pavement in the area where Whelan fell and that therefore the Government acquiesced in the violation of appellant's duty under the agreement to maintain the pavement. However, the court below found that "[n]o evidence has been adduced to indicate that the United States discovered or acquiesced in the dangerous condition in the area where the accident occurred," and Federal Storage Warehouse has not demonstrated that this finding is incorrect.

Affirmed.

MANSFIELD, Circuit Judge (dissenting):

I agree with Judge Smith's carefully considered opinion except for his conclusion that the jury was entitled under the Boiler Inspection Act, 45 U.S.C. § 23, to find Penn Central liable on the ground that the accident was caused in whole or in part by a thin coating of ice on parts of the steps and handholds of the locomotive, which had accumulated as the result of a light rain and sleet that occurred at a temperature of 30° as the crew was engaged in the performance of its duties. The majority's holding on this issue is of crucial significance for the reason that while other defects and violations were also alleged to have contributed to the accident, the evidence indicates rather clearly that the principal, if not sole, cause may well have been the slippery conditions attributable to the coating of ice.

In my view the Boiler Inspection Act, as its title, text and legislative history indicates, was designed to protect against defective equipment or dangerous conditions directly connected with the operation of the locomotive itself and not against conditions attributable solely to the transitory vagaries of Mother Nature. Accordingly I would reverse and remand the case for a new trial.

As Judge Friendly pointed out in his concurring opinion in Calabritto v. New York, New Haven and Hartford R. Co., 287 F.2d 394, 397 (2d Cir. 1961):

"The language of the Boiler Inspection Act, 36 Stat. 913, § 2 (1911), 45 U.S.C.A. § 23, does not suggest to me a Congressional purpose to impose on railroads an absolute duty to keep the surfaces of locomotives and tenders as free from foreign matter at all times, as an operating room before surgery. If the Act does this I see no way of limiting the requirement to such substances as oil and grease; it must extend also to substances as unavoidable in railroad operation as snow and ice. Such a construction means that rail-

roads face an inevitable conflict between the duty thus imposed, carrying the sanction of a $250 penalty for 'each and every such violation,' 45 U. S.C.A. § 34, as well as of liability to employees, and their duty to render reasonable service to passengers and shippers; if the New Haven chose to regard the former as paramount, there would, I fear, be many occasions during the New England winter when we would be bereft of the presence of our colleagues from Connecticut and Vermont. Neither does anything in the legislative history of the Act afford the slightest basis for such a construction; indeed, it points rather in the opposite direction.[1] If I were free

1. The initial debate on the floor of the House indicated that the legislators were primarily concerned with boiler explosions. Representative Mann, chairman of the House Committee on Interstate and Foreign Commerce, which reported the bill, said 'It is the belief of all people concerned, both the railroads and the employees, that the passage of this bill will materially result in the lessening of boiler explosions.' 46 Cong.Rec. 2071 (1911). Representative Robinson spoke of accidents caused by 'defective boilers,' id. at 2072, and Representative Peters of explosions, steam pressure, and the need to inspect boilers from the inside, id. at 2074.

The broadening of the Act in 1915 was recommended by the Senate Committee on Interstate Commerce in a one-page report, S.Rep., 63rd Cong., 3d Sess., No. 1068, which said only:

" 'This measure provides for the inspection of the entire locomotive. Experience has shown that this is necessary and desirable for the proper safeguarding of the lives of those who travel and of those engaged in the operation of locomotives.'

"The House Report on the 1924 amendment, 68th Cong., 1st Sess., No. 490, reprinted a letter from the Interstate Commerce Commission which spoke in passing of accidents 'resulting from the failure of some part of appliance of the locomotive or tender.' P. 3. The Senate Report, No. 740, simply reprinted the House report with approval."

to exercise my own judgment, I should therefore wholly agree with the interpretation given by this Court in Ford v. New York, New Haven & Hartford R. Co., 2 Cir., 1931, 54 F.2d 342,

where we affirmed the dismissal of a complaint based on the theory that the mere presence of a foreign substance violated the Safety Appliance and Boiler Inspection Acts.

The majority here finds itself bound by the Supreme Court's decision in Lilly v. Grand Trunk Western R. Co., 317 U. S. 481, 487–488, 63 S.Ct. 347, 87 L.Ed. 411 (1943), to uphold the district court's instruction leading to the jury's verdict, even though the result does violence to Congress' expressed purposes in enacting the Boiler Inspection Act. However, I believe that since this case is clearly distinguishable in legally significant respects from Lilly and Calabritto, a reversal here would not only be consistent with those cases but would be in accord with the purpose of the Act.

In Lilly, the problem case, the Supreme Court found that the Act extended to the formation of ice on a six-foot square area on top of the locomotive tender, located between "the water manhole and the fuel space." Although the jury found no leak in the collar of the water manhole, it is clear that this specific area was considered to be uniquely prone to the collection of water from the operation of the locomotive itself. The Interstate Commerce Commission had adopted a rule relating to "Fuel Water Tanks" (Rule 153), which obligated the railroad to keep this small part of the top of the tender clean and to provide means "to carry off waste water." With respect to this rule the Court said: "From the phrasing of Rule 153 we think it aimed at requiring the top of the tender to be kept free of foreign matter which would render footing insecure, for example, coal, dust, debris, grease, waste water, and ice", 317 U.S. 486–487, 63 S.Ct. 351 (emphasis added). Referring to earlier decisions of various Courts of Appeals holding that the presence of foreign substances did not violate the Act, the Supreme Court went on to say "Whatever else may be said about the cases relied upon by respondent, they are sufficiently distinguishable in that they either did not involve or did

not consider Rule 153 or any comparable regulation," 317 U.S. at 488, 63 S.Ct. at 352. See Raudenbush v. Baltimore & O. R. Co., 160 F.2d 363 (3d Cir. 1947).

Thus *Lilly*, in my view, did not liberalize the interpretation of the Boiler Inspection Act to the extent claimed by appellee here. Although the presence of foreign matter causing an accident may violate the Act, it must, as I read *Lilly*, be attributable to or connected with the operation of the locomotive itself. See Turner v. Clinchfield R.R. Co., 489 S.W. 2d 257 (Ct. of App., Tenn), cert. denied, 411 U.S. 973, 93 S.Ct. 2168, 36 L.Ed.2d 696 (1973). Thus in *Calabritto* this Court upheld a finding of liability based on the presence of oil and sand on the platform of one of the switching engines, which obviously was produced by the operation of the equipment. In the present case, in contrast, the formation of a thin coating of ice on the steps and grabirons could by no stretch of the imagination be attributed to the operation of the equipment. Furthermore, the present case "did not involve . . . Rule 153 or any comparable regulation," 317 U.S. at 488, 63 S.Ct. at 352.

To extend liability under the Boiler Inspection Act to the mere transitory presence of ice which forms because of weather conditions developing during the course of operation places railroads, many of which are already bankrupt, in an impossible position. Such a holding means that unless the railroad, when such an unforeseen condition develops, immediately stops operations, it becomes vulnerable not only to damage suits, which some may dismiss as one of the risks of the business, but, more important, to suits by the United States for heavy penalties based upon violation of the Act. Such a result is unfair and unrealistic. It wholly exceeds Congress' declared purpose in enacting the Act and the Supreme Court's interpretation of it. I would draw the line at the outer limits which I have specified.