**William Knight, Appellee, v. Chicago and North Western Railway Company, Appellant.**

**Gen. No. 46,156.**

Opinion filed October 19, 1954. Rehearing denied November 16, 1954. Released for publication January 4, 1955.

LOWELL HASTINGS, and DRENNAN J. SLATER, of Chicago, for appellant; GERALD M. CHAPMAN, of Chicago, of counsel.

JAMES A. DOOLEY, of Chicago, for appellee.

MR. JUSTICE ROBSON delivered the opinion of the court.

Plaintiff filed his action against the Chicago and North Western Railway Company, defendant, to recover damages for personal injuries sustained while working as a freight brakeman. The original action consisted of a single count based upon the Federal Employers' Liability Act, as amended (U. S. C. Title 45, secs. 51–60). The complaint was subsequently amended by adding another count based on section 2 of the Federal Safety Appliance Act (U. S. C. Title 45, sec. 11). A jury returned a verdict for plaintiff in the sum of $25,000. The usual post-trial motions were made and also a motion for remittitur, which were denied, and judgment on the verdict was rendered in favor of the plaintiff from which defendant appeals.

The record discloses that at the time plaintiff was injured he was 23 years old and had been employed by defendant as a freight brakeman for about three years. The accident occurred about 9:30 p. m. on May 21, 1950, at Norma, on the outskirts of Des Plaines, Illinois. On that day plaintiff was assigned to work as the rear brakeman with a crew consisting of a conductor, engineer, fireman, head brakeman and himself. The crew that day had gone from Proviso, Illinois, to Janesville, Wisconsin, and was returning to Proviso. It had been raining. At the time of the accident the train consisted of 41 cars. The train reached Norma about 8:30 p. m. and before it could go on to Proviso it was necessary to cut off four cars from the head and set them out on an industry track. At Norma there are two main-line tracks and a track known as the live "wye" running north and south. At grade level the wye track crosses an east and west highway known as Thacker street. The condition of the right of way is narrow and not too even, and is covered with cinders and rocks. It is only about a foot beyond the overhang of the cars, which is about two feet. The engine was just a few feet north of Thacker street, where the trains stopped. Plaintiff, who had been riding in the engine cab, a diesel, got down, pulled the pin to cut off the four head cars, gave the necessary signals to get the engine and four cars on the industry track, cut off the cars, signaled the engine on to the south, then backed it on to the remaining 37 cars. While the cars were being set out, the head brakeman walked to a telephone located on the west side of the wye track and phoned a tower located at Deval to get clearance for the train to move on to the southbound main-line track and then on to Proviso. Shortly after the engine had been coupled back on the train, the head brakeman gave a signal with his lantern to indicate that the train was to pull on south. Plaintiff boarded the rear of the second diesel unit, walked

through it and the first unit to the engine cab and rode south to where the head brakeman was then standing near the telephone. Plaintiff alighted near where the brakeman was standing and asked if it would be necessary to reline the switches after the train had reached the southbound main line. He was told it was not necessary.

The head brakeman boarded the engine to ride in the cab and plaintiff started walking north on the west side of the wye track to board the caboose when it came by. He had intended to go to Thacker street where there was a level place to board. He had gone about 200 feet when he saw the caboose marker lights nearing Thacker street. He then realized he would not be able to make it back to the crossing and decided to board the train from the right of way. He noticed that it was picking up speed and gave an easy signal. He remembered that the signal could not be seen by the engineer because his vision was cut off by a northbound train waiting just at the south of the cross-over switch. Where he was standing the right of way was narrow. He turned and went back about 50 feet to get to a point where the right of way was wider and where the boarding would be easier. As the caboose approached him it was traveling about eight or ten miles an hour. He said the customary speed until the crew had all boarded was four to five miles an hour. He put his right hand on the grab iron and left foot on the center part of the bottom step of the caboose. His lantern and packing iron were in his left hand. This was the customary and usual means of boarding a caboose. This was corroborated by the conductor of the train. As he swung on, his left foot slid back to the rear end of the wooden step causing him to lose his grip and come down on the right of way with his right knee. He did not know the cause of his slipping. He admitted that the cause might have been cinders on the soles of his shoes.

The conductor, who was looking out of the caboose window, saw plaintiff fall and immediately set the brakes and brought the train to a stop within a few hundred feet of where plaintiff was lying. He helped plaintiff and they boarded the caboose. It was discovered his right knee was skinned and bleeding and first aid was administered. When they arrived at the Proviso yard, plaintiff and three members of the crew inspected the step. It is undisputed that it was wet. Plaintiff testified that he noticed it was smooth and quite worn in the center. The conductor said it was smooth, the paint was worn off, slightly rounded, but not enough "to bad order the step." He had difficulty with the same step later. The other two testified it was worn and smooth.

The first question we must consider pertains to Count II which was filed as an amendment to the complaint, charging defendant with failure to keep the steps of the caboose safe and secure as required by the Federal Safety Appliance Act. The caboose in question had box steps. Defendant contends that Congress in enacting the Safety Act of 1910 (45 U. S. C. 11–16) did not delegate to the Interstate Commerce Commission the power to regulate caboose platform or box steps, only sill steps. Section 2 of that Act (ch. 160, sec. 2, 36 Stat. 298) makes it unlawful for any common carrier to haul or use any car not equipped with "secure sill steps" and efficient hand brakes, and in certain instances secure ladders, running boards and handholds. The Commission on March 13, 1911, following the passage of the Act, adopted an order entitled, "In the matter of designating the number, dimensions, location and manner of application of certain safety appliances." (Roberts Federal Liabilities of Carriers, 2nd Edition, Vol. 2, pp. 2010–2031.) In it under the heading "Caboose cars with Platforms" appears the subheading "Caboose Platform Steps" and under that heading is the follow-

ing: "Safe and suitable box steps leading to caboose platforms shall be provided at each corner of the caboose. Lower tread of step shall be not more than 24 inches above top of rail." It is defendant's contention that this portion of the order was beyond the scope of the Commission's authority and, therefore, void.

 When Congress passed the Federal Safety Appliance Act over 44 years ago its primary object was to protect employees and the public from injuries because of defective appliances upon locomotives and cars used on the highways of interstate commerce. *Swinson v. Chicago, St. P., M. & O. Ry.,* 294 U. S. 529; *Tipton v. Atchison, T. & S. F. Ry. Co.,* 298 U. S. 141. It could not and did not have in mind every specific evil that would be corrected by the various sections of the Act. The duty of interpreting and carrying out the provisions of the Act was of necessity left to the Interstate Commerce Commission. The members of this Commission have an extensive knowledge of the industry to which the Act applies. To them was delegated the responsibility of interpreting the provisions of the Act by their regulations and orders. *United States v. Pennsylvania R. Co.,* 323 U. S. 612. And cf. *American Trucking Ass'ns. v. United States,* 344 U. S. 298. The order in question interpreting "secure sill steps" as covering caboose platform steps has been in effect for over 43 years. In construing it great weight should be given to the Commission's contemporaneous interpretation and long-continued practical construction of the Act (*Brooks Transp. Co., Inc. v. United States* (D. C., Va.), 93 F. Supp. 517, 522, and authorities collected there, affirmed per curiam 340 U. S. 925), and, while not conclusive with the courts, it is persuasive (*Davis v. Manry,* 266 U. S. 401, 405). Cf., also, *United States v. Shreveport Grain & Elevator Co.,* 287 U. S. 77, 84; *Commissioner v. South Texas Lumber Co.,* 333 U. S. 496, 501; *Commissioner of Internal Rev-*

*enue v. Nubar* (C.A., 4th), 185 F.2d 584, 587, certiorari denied 341 U. S. 925. These rules are properly limited in general application to cases of doubtful meaning. Usage, while it cannot alter the law, should not be disregarded where its importance in the total view of things buttresses and is buttressed by other factors, such as the purpose of the statute, its result if interpreted and construed in one way rather than another. See, e. g., *United States v. Macdaniel,* 7 Peters (32 U. S.) 1, 14; *Ramspeck v. Federal Trial Examiners Conference,* 345 U. S. 128, 142.

In the Commission's order of March 13, 1911, defining, classifying and designating the appliances covered by the Act, are found specifications and drawings covering two caboose types, one with and the other without end platforms. In the former, use is made of box or platform steps; in the latter, sill steps. See Richey, Federal Employers' Liability (2d ed., 1916), pp. 719–20 (Plates Q and R). There is nothing in the record to indicate that when Congress legislated and enacted the provisions of the Act into law both types of caboose cars were not in use, or that those without platforms and, therefore, with sill steps were not widely used. There is nothing in the record from which we can logically reason that steps in function identical, though different in construction, should because of that fact alone fall outside the scope of the congressional intent to lessen the hazards surrounding the railroad employees using them.

■ The Act uses "secure sill steps." "Secure" has been interpreted to mean "safe," that is, not merely securely fastened and meeting the requirements of the Commission as to material, dimension and location, but also furnishing secure footing for employees having to use them. See *Davis v. Reynolds* (C.C.A., 4th) 280 Fed. 363, 365–6, certiorari denied 258 U. S. 627; *Edwards v. Southern Ry. Co.,* 52 Ga. App. 557, 184 S. E.

370, 380, cases arising under the Boiler Inspection Act. In *Stewart v. St. Louis-San Francisco Ry. Co.* (Mo. App.), 262 S. W. 440, box steps of a platform caboose were held to be included within the term "sill steps." And see *Stanczak v. Pennsylvania R. Co.* (C.A., 7th), 174 F.2d 43. We are of the opinion that the only fair and reasonable interpretation of the intent and scope of the Federal Safety Appliance Act under the circumstances is that the Commission's order of March 13, 1911, requiring carriers to keep box steps leading to caboose platforms safe at all times, was within the scope of its authority.

Defendant cites several cases to support its contention. We will consider the two which it contends are in point. In *Hill v. Minneapolis, St. P. & S. S. M. Ry. Co.,* 160 Minn. 484, 200 N. W. 485, the court in interpreting the order involved held it did not pertain to a railroad passenger train's platform step but only to a step on a caboose. The court distinguishes coach steps from caboose steps even though the steps may be similar in construction and holds that the Commission had no power to regulate the box steps of passenger coaches. In *Fleming v. Richardson,* 237 Iowa 808, 24 N.W.2d 280, the issue raised was whether a State Commission had the right to regulate end platform steps of a caboose. In a five to four opinion the court held that viewing the specific appliances enumerated in section 11 of Title 45, U. S. C. A., the Commissioner's order of March 13, 1911, did not, merely because accompanied by specifications and drawings of the entire caboose car, standardize the entire caboose car and make it, as drawn with and without end platforms, a safety appliance. It was not the intent of Congress to have the Act apply to a caboose platform—only to sill steps attached to a caboose. The Iowa State Commerce Commission, therefore, had the right to regulate the type of platforms on cabooses to be used in intrastate

510

commerce. It also held that cabooses are not cars within the meaning of the term as used in the title to the first and second Safety Appliance Acts (45 U. S. C. A., ante section 1). We cannot agree with the narrow interpretation of the Act as set forth in the majority opinion. The minority opinion holds that the platforms of a caboose car come within the Safety Appliance Act, which is in line with our decision. We consider it better precedent.

■ We must now decide whether there is evidence in the record that the caboose step was defective. Plaintiff and three of the members of the crew examined the step after it had pulled in at the Proviso yard. Each testified that the step was worn and rounded. The conductor in charge of the crew testified that he had difficulty with the same step later. Defendant failed to object to this admission and it is therefore admissible for all purposes. (*Ascher Bros. Amusement Enterprises v. Industrial Commission*, 311 Ill. 258, 261.)

■ Plaintiff, in addition to the testimony of the members of the crew, as to the condition of the step, introduced testimony that the newer cabooses (about a third of the total in use) have steel corrugated steps which are perforated; that the surface of such step is rough and affords a sure footing. The same witness testified that about two-thirds of the cabooses have wooden steps and that some of the cabooses with wooden steps have a gravelized roofing paper nailed or tacked on which makes for a sure footing. To controvert this, defendant called four witnesses whose testimony in substance was that gravelized paper was not used on the steps, that steel steps are used for maintenance reasons only since they do not wear down as quickly as wooden steps but as between a steel step and a wooden step one is no more slippery than the other; that when they are wet they are about equal as far as adherence is concerned. Defendant introduced

511

a photograph of the step showing the paint worn off and its edges smoothed and rounded. It is contended that there was nothing wrong with the step nor was it in bad order. This was an issue of fact and it was for the jury to decide whether the defendant was guilty of a violation of the Safety Appliance Act which was the proximate cause of plaintiff's injury. *Williams v. New York Cent. R. Co.,* 402 Ill. 494. *Stanczak v. Pennsylvania R. Co.,* (C.A. 7th), 174 F.2d 43; *Ellis v. Union Pacific R. Co.,* 329 U. S. 649, 653.

■■ The next contention of defendant that we will consider is that plaintiff was not injured as a proximate result of the failure of defendant to furnish a reasonably safe place in which to work. We have already passed on the question of the defective condition of the caboose steps and are, therefore, only required to consider the question of the roadbed at the place where plaintiff attempted to board the train. He testified that the right of way on the west side of the wye was narrow and uneven; that cinders and rocks were there; that the width was about a foot beyond the overhang of the cars. Just prior to the accident he realized it would be necessary to board the train from the right of way and that it would be impossible for him to board the train from where he was first standing. He walked back a distance of about 50 feet to where the right of way was a little wider. It was dark. He was carrying a lantern and also had a packing iron in his left hand as he attempted to board the caboose. Defendant introduced a picture that it contends shows that the right of way was amply wide for plaintiff to swing on the train and that it was level. In the recent cases of *Pitrowski v. New York, C. & St. L. R. Co.,* 4 Ill.2d 125, and *Bonnier v. Chicago, B. & Q. R. Co.,* 2 Ill.2d 606, our Supreme Court has held that in passing on cases arising under the Federal Employers' Liability Act we must follow the prevailing view of the Federal courts. There

was sufficient evidence to support the submission of this issue to the jury.

 Defendant next contends that plaintiff was injured as a proximate result of the operation of the train at a high and dangerous rate of speed. The evidence most favorable to the plaintiff shows that the train was going at about eight or ten miles an hour. He said that the customary speed was four or five miles an hour until the engineer was certain that all the crew was aboard. There was testimony that a speed of eight miles an hour is safe for boarding the train. Under the circumstances, the question was one of fact for the jury. *Pitrowski v. New York, C. & St. L. R. Co., supra; Bonnier v. Chicago, B. & Q. R. Co., supra.*

 Defendant contends, further, that the trial court erred in refusing to allow in evidence certain statements signed by the plaintiff. Following the accident plaintiff made application for insurance benefits and signed two statements. In response to questions on the statements regarding the manner in which he was injured he stated: "I was getting on a moving caboose and slipped on a wet step injuring my knee." The trial court refused to allow this statement to be introduced in evidence. Defendant contends that because plaintiff failed to describe the condition of the caboose step, the speed of the train and the condition of the right of way, these statements should have been admissible for the purpose of impeachment. From an examination of the statements it is apparent that they were not repugnant or inconsistent with plaintiff's testimony at the trial. They were, therefore, inadmissible for the purpose of impeachment. *Johnson v. N. K. Fairbank Co.,* 156 Ill. App. 381, 390; *Hall v. Scott,* 231 Ill. App. 494.

 Defendant's further contention is that the verdict of the jury was excessive. Plaintiff was 23 years of age at the time of the accident. He was earning

about $3,000 a year and had over $5,000 in lost time at the date of the trial. His knee was treated for eleven months and then he had to submit to surgery for the removal of a patella. The record discloses that this resulted in certain permanent and disabling conditions in the leg. There was about three-fourths of an inch of atrophy in the right thigh and three-eighths of an inch of atrophy in the right calf. Plaintiff still had pain in his knee on change of weather and could not stand over half an hour without the knee swelling. He could not walk over two or three blocks without it swelling. Under all the circumstances we do not consider the verdict excessive.

▆▆ Defendant finally contends that certain instructions given by the trial court were erroneous and that the closing argument made by plaintiff's attorney was highly prejudicial. We have examined the instructions complained of and find none that constitutes reversible error. While there was some irregularity in a portion of plaintiff's argument, we are of the opinion that it was not such as to constitute reversible error.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

SCHWARTZ, P. J. and TUOHY, J., concur.