**ST. LOUIS SOUTHWESTERN RAIL-WAY COMPANY, Appellant,**

v.

**Glen WILLIAMS, Appellee.**

No. 25302.

United States Court of Appeals Fifth Circuit.

June 14, 1968.

Rehearing Denied Aug. 12, 1968.

Jack W. Flock, Clyde W. Fiddes, Roy P. Cosper, Mike A. Hatchell, Tyler, Tex., for appellant; Ramey, Brelsford, Flock, Devereux & Hutchins, Tyler, Tex., of counsel.

Franklin Jones, Jr., Frank Jones, Sr., Jones, Jones & Baldwin, Marshall, Tex., for appellee.

Before RIVES, BELL and GOLD-BERG, Circuit Judges.

RIVES, Circuit Judge:

Appellee-plaintiff sued under the Federal Employers' Liability Act,[1] the Safety Appliance Act,[2] and the Boiler Inspection Act.[3] He recovered a verdict and judgment in the amount of $85,000.00, solely upon the theory of absolute liability imposed by the Boiler Inspection Act. The appellant-defendant urges that the district court erred: (1) in submitting the case to the jury on the theory of a violation of the Boiler Inspection Act; (2) in failing to instruct the jury that it could not award damages resulting from a separate intervening cause; and (3) in failing to grant defendant's motion for new trial because of excessive damages.

The plaintiff was a student switchman. His job required that he ride on one of the steps of the engine and jump off and throw switches to direct movement onto the proper track, and then remount one of the engine steps.

On the night of his accident, while plaintiff was waiting for the engineer, he observed oil on the cab of the engine and on the running board—"just black oil—diesel oil I guess—blows out of those engines." He did not look at the steps at that time. As he began work he rode the rear step and had no difficulty. Several hours later when he had occasion to remount on the front step, he slipped and noticed that there was oil on that step. Plaintiff testified that as they approached the next switch, "He was slowing down, and I leaned off and gave him a stop signal and started to get off, and when I did I stepped with my right foot, and my left foot slipped off and my hand I lost the grab iron hold."

"Q. What did your left foot slip on?

"A. Oil on the steps.

\*   \*   \*   \*   \*   \*

"Q. Did the presence of the oil on that step make it a hazard and unsafe to a man getting on and off of it?

"A. It sure did.

"Q. What happened when you stepped off that time and slipped?

"A. I fell and turned my ankle, and it popped like everything. So, I just laid there a few minutes and Mr. Savage—the engine didn't move very far. It stopped in just a minute."

After showing the engineer the oil on the step, the plaintiff attempted to continue working, but his ankle was swollen and hurt so that he was relieved by C. R. Strother, another switchman. Strother testified that when he relieved plaintiff, he looked at the right front step of the engine and observed oil on it, "it was just oily and unsafe to work with right at that time." Neither the plaintiff nor the defendant offered direct evidence as to the source of the oil nor how long it had been on the step. However, we think that the jury could draw an inference from the presence of oil on the cab of the engine and on the running board when it was turned over to plaintiff's crew and from the defendant's failure to offer the testimony of an employee who

---

1. 45 U.S.C.A. § 51 et seq.

2. 45 U.S.C.A. §§ 1–18.

3. 45 U.S.C.A. § 23.

should have known whether the engine was clean at that time.[4]

Discussion of the extent of plaintiff's injuries is postponed until we reach the question of excessive damages.

### Application of the Boiler Inspection Act.

■ The Boiler Inspection Act provides in pertinent part:

"It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb * * *." 45 U.S.C.A. § 23.[5]

In determining whether the jury could properly find that the presence of oil on the step of the locomotive constituted a violation of that section, the construction and meaning of the Supreme Court's decision in Lilly v. Grand Trunk Western R. Co., 1943, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411, is crucial. Prior to that decision, the cases of Ford v. New York, N. H. & H. R. Co., 2nd Cir. 1931, 54 F.2d 342, and Reeves v. Chicago, St.P., M. & O. Ry. Co., Minn.1920, 147 Minn. 114, 179 N.W. 689, were clearly in favor of the defendant's position. Those cases were considered by the Supreme Court in Lilly, supra, but the defendant urges that, instead of disapproving the holdings as no longer the law, the Supreme Court distinguished them solely on the basis that they did not involve a violation of an applicable regulation of the Interstate Commerce Commission. The Court's language, in our opinion, shows that it not only distinguished the Ford and Reeves cases, but that it also disapproved their holdings.

"From various cases denying recovery under the Act, respondent attempts to extract a general rule that the Act . covers only defects in construction or mechanical operation and affords no protection against the presence of dangerous objects or foreign matter.[7]

"[7] Ford v. New York, N. H. & H. R. Co., 2 Cir., 54 F.2d 342 (grease on a locomotive grab-iron held no violation of Safety Appliance and Boiler Inspection Acts); Reeves v. Chicago, St. P., M. & O. Ry. Co., 147 Minn. 114, 179 N.W. 689 (presence of coal upon a step leading to the locomotive cab held no violation of Safety Appliance and Boiler Inspection Acts); Slater v. Chicago, St. P., M. & O. Ry. Co., 146 Minn. 390, 178 N.W. 813 (holding no cause of action under Safety Appliance Act for injuries caused by an ice bunker displaced by a trespasser so it projected upon the running board); Chicago, R. I. & P. Ry. Co. v. Benson, 352 Ill. 195, 185 N.E. 244 (Safety Appliance Act held not violated by wrapping wire around grab-irons); Harlan v. Wabash Ry. Co., 335 Mo. 414, 73 S.W.2d 749 (failure of fellow employees to close a trap door in the cab over the stoker held no violation of the Boiler Inspection and Safety Appliance Acts); Riley v. Wabash Ry. Co., 328 Mo. 910, 44 S.W.2d 136 (holding no cause of action existed under Boiler Inspection Act for injuries sustained because a clinker hook was misplaced on a tender top by a fellow servant).

But there is no warrant in the language of the Act for construing it so narrowly, or for denying the Commission power to remedy shortcomings, other than purely mechanical defects, which may make operation unsafe. The Act without limitation speaks of

---

4. Mr. Finch, defendant's trainmaster, testified on cross-examination:
"Q. Whose responsibility is it to see that the engines are kept clean?
"A. The Mechanical Department.
"Q. And who is that?
"A. At Tyler Mr. Woods is Mechanical Supervisor.
"Q. Is he here today?
"A. Yes, sir.

"Q. Have you ever talked to Mr. Woods about the condition of that engine that night?
"A. Yes, sir.
"Q. When?
"A. I called him immediately after I learned of the accident that morning."

5. On the construction and application of this Act, see Annot., 90 A.L.R.2d 599 and 80 L.Ed. 743.

equipment 'in proper condition and safe to operate * * * without unnecessary peril to life or limb.' Conditions other than mechanical imperfections can plainly render equipment unsafe to operate without unnecessary peril to life or limb. Whatever else may be said about the cases relied upon by respondent, they are sufficiently distinguishable in that they either did not involve or did not consider Rule 153 or any comparable regulation."

317 U.S. at 487, 488, 63 S.Ct. at 352.

The injury in *Lilly* was caused by ice which had formed on the tender of the locomotive. In answer to a special interrogatory, the jury found that formation of the ice was not due to any mechanical defect in the engine. The Supreme Court construed Rule 153 of the Interstate Commerce Commission as "requiring the top of the tender to be kept free of foreign matter which would render footing insecure, for example, coal, dust, debris, grease, waste water, and ice." 317 U.S. at 486–487, 63 S.Ct. at 351. The defendant insists that the Court's actual holding in *Lilly* is restricted to foreign matter on a locomotive, the presence of which violates an administrative rule or regulation which has become a part of the Boiler Inspection Act, and urges upon us a consideration of the legislative history of the Act [6] which it insists shows that the purpose of the Act is limited to defects in the design or construction of the locomotive and to equipment which has become mechanically defective. Again, however, we think that the holding in *Lilly* cannot be so narrowly construed. A broader holding is indicated by the passage which we have quoted and also by the Court's language both immediately before and immediately after discussing ICC Rule 153. Preceding such discussion, the Court stated:

"The use of a tender, upon whose top an employee must go in the course of

his duties, which is covered with ice seems to us to involve 'unnecessary peril to life or limb'—enough so as to permit a jury to find that the Boiler Inspection Act has been violated. Fortunately, we are not left wholly to our own resources in construing the Act in the light of its humanitarian purpose. The Interstate Commerce Commission has set the standard here by promulgating a rule (No. 153) * * *." 317 U.S. at 486, 63 S.Ct. at 351.

After discussing the rule, the Court said: " * * * the rule only fortifies a result which we think the jury could probably have reached even in the absence of such a rule." 317 U.S. at 489, 63 S.Ct. at 352.

Our interpretation of the holding in *Lilly* is sustained by the thoroughly considered case of Calabritto v. New York, New Haven & Hartford R. Co., 2nd Cir. 1961, 287 F.2d 394. There Judge Clark said:

"If the Commission had enacted a rule requiring engine platforms to be kept clear of slippery substances, clearly the jury could have concluded that an engine platform made slippery by sand and oil was in an unsafe condition within the meaning of § 23. The absence of such a rule, which would only be declaratory of common sense, can make no difference to the jury's right to reach such a conclusion. It would be indeed an anomaly to require enforcement of a Congressional mandate for safe railroad equipment to depend upon the action or nonaction of an administrative agency." 287 F.2d at 396.

Judge Friendly reluctantly concurred, stating:

"If I were free to exercise my own judgment, I should * * * wholly agree with the interpretation given by this Court in Ford v. New York, New Haven & Hartford R. Co., 2 Cir., 1931, 54 F.2d 342 * * *.

6. Citing 46 Cong.Rec. 2071, 2072, 2074; 52 Cong.Rec. 5355; 36 Stat. 913, ch. 103, Feb. 17, 1911; and 38 Stat. 1192, ch. 169, § 1, Mar. 4, 1915.

" * * * However, when the precedent is a decision of the Supreme Court, our handling must be more literal; despite my own belief that the result goes beyond any purpose signified by Congress, I think the interpretive scale comes down slightly on the side that the Lilly opinion went all the way Judge Clark says * * *." 287 F.2d at 397, 398.

Judge Waterman was similarly reluctant, but did concur.

"Like Judge Friendly, I arrive at this result with great reluctance, and if I did not consider ourselves bound by the language in Lilly v. Grand Trunk Western R. Co., supra, I would reverse and remand for a new trial." 287 F.2d at 397.

The later Sixth Circuit case of Gowins v. Pennsylvania Railroad Co., 1962, 299 F.2d 431, also supports our interpretation of *Lilly*. We hold, therefore, that the district court properly submitted the case to the jury on the theory of absolute liability imposed by the Boiler Inspection Act.

### Separate Intervening Cause.

█ The evidence is conclusive that the later turning of plaintiff's ankle was not due to a new and intervening cause but was the proximate result of the original injury. Dr. Tate testified:

"Q. As a practical matter, Doctor, what difficulty will that cause a person such as Glen Williams?

"A. Well, it increases wear and tear by having too much motion. This makes it easy to hurt, to reoccur as we call it, and anytime—since it is a weakened ligament-joint, any increased pressure on it or weight strain put on it, it will give and become painful."

The plaintiff testified:

"Q. And I believe that on one occasion here recently you had trouble with your ankle when you got out of bed?

"A. Yes, sir.

"Q. Tell us about that.

"A. Well, one morning I got out of the bed to go to the bathroom and I turned it and it kind of hurt it again. I fell.

"Q. Did you just step on it or—

"A. I just got out of bed, leaned out of bed and it turned right then, asleep.

"Q. That's all."

Under that factual situation, there was no occasion for the court to instruct the jury that it could not award damages resulting from a separate intervening cause. See City of Port Arthur v. Wallace, 1943, 141 Tex. 201, 171 S.W.2d 480; 22 Am.Jur.2d, Damages § 111, p. 161 and § 115, p. 167.

### Excessive Damages.

█ The Supreme Court has never definitely settled the question of whether a Court of Appeals may direct that a new trial be granted because the verdict was excessive.[7] However, all of the Circuits,[8] including our own,[9] are committed to the doctrine of some appellate supervision over the size of jury verdicts. The plaintiff asks that we again review the constitutionality of any such appellate review, but we adhere to the doctrine that the district court's ruling on a motion for new trial based on excessiveness of the verdict may be reviewed for abuse of discretion.

7. See the full discussion in 3 Barron & Holtzoff, Fed.Prac. & Proc., Rules ed., § 1302.1, pp. 351, 352, and in 6A Moore's Fed.Prac., 2nd ed., ¶ 59.08[6], pp. 3827–3834.

8. See 3 Barron & Holtzoff, p. 349 n. 17.20 and pocket supp.; 6A Moore's Fed.Prac., 2nd ed., ¶ 59.08[6], p. 3836.

9. Whiteman v. Pitrie, 5th Cir. 1955, 220 F.2d 914, Phoenix Indemnity Co. v. Givens, 5th Cir. 1959, 263 F.2d 858.

The test is necessarily uncertain and indefinite (see Whiteman, supra, 220 F.2d at 919). It has been indicated that courts of appeals should be extremely cautious in holding that a district court has abused its discretion.

"In Neese v. Southern Ry. Co.[17.29] the

"[17.29] 1955. 76 S.Ct. 131, 350 U.S. 77, 100 L.Ed. 60.

Court granted certiorari where the petition brought before it the question whether the courts of appeals have power to review a denial of a new trial for excessive damages, but the Court never reached the question of power. It found that there was evidence to support the verdict, and held that therefore the court of appeals, whether or not it had the power, should not have intervened.[17.30] Since the Fourth

"[17.30] To similar effect see Snyder v. U. S., 1955, 76 S.Ct. 191, 350 U.S. 906, 100 L.Ed. 796.

Circuit had treated the verdict in the Neese case as if it were an extreme example of an excessive verdict,[17.31] the

"[17.31] It called the verdict 'far beyond the pale of any reasonable probability and entirely without support in the record.' Southern Ry. Co. v. Neese, C.A. 4th, 1954, 216 F.2d 772, 776.

reinstatement of the trial court judgment by the Supreme Court shows, at a minimum, that courts of appeals should be cautious indeed in interfering with the decisions of trial courts on motions for a new trial based on a claim of excessive damages. * * *"

3 Barron & Holtzoff, Fed.Prac. & Proc., Rules ed., § 1302.1, pp. 351, 352.

This case was tried in an exemplary manner without appeals to passion or prejudice by either side and under the careful guidance of an able trial judge. The defendant's motion for new trial was well argued in letter briefs and its denial expressed the deliberate judgment of the trial judge.

The injury was more than a simple sprained ankle. The plaintiff had stayed in the hospital intermittently for about three weeks. His foot was kept in a cast for a month and a half, the cast was removed for two weeks, and then another cast was kept on the foot for three weeks. At the time of trial, one year after the injury, the ankle was still painful and subject to swelling. Doctor Tate testified that the plaintiff's condition is permanent. "I think he is going to have to live with it from now on in." "I don't think he can be cured." The doctor further testified: "He's got hemorrhage in there which has healed which gives him a lengthening of the ligament, which when you get a lengthening of the ligament, these bones are not held in proper alignment, giving an unstable joint." He would not be passed on pre-employment examination for any job requiring him to do manual labor. The plaintiff had never had any other kind of job. He lacked "half a credit" of graduating from high school. He had worked as a roughneck in an oil field, as a helper in a pipe and foundry works, at surveying, and at electrical wiring, in addition to less than two months as a student switchman. Strother, the switchman who relieved plaintiff after his injury, testified:

"Q. What kind of a worker was he?"

"A. Well, he was just about one of the best they have hired down there in the last ten years I would say." During the year between injury and trial, the plaintiff had lost approximately $7,200.00 in wages. He was 28 years of age at the time of the accident, had a life expectancy of 43 years and a work life expectancy of 32.72 years. If he had continued at an annual wage of $7,200.00 without increase or decrease, he would have earned during his work expectancy more than $235,000.00. It was open to the jury to reason that his wage rate would probably have increased and that his expectancy of earnings would have been larger. The degree of disability and the extent to which plaintiff's earnings would probably be reduced were matters for the jury's determination. The plaintiff was entitled also to reasonable compensation for his pain and suffering and for reasonable costs of future medical treatment caused by his injury.

Under all of the evidence, we cannot hold that the district court abused its discretion in denying the motion for new trial. The judgment is

Affirmed.