ALVA R. THOMAS, Plaintiff-Appellee, v. NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellant.

Fifth District    No. 5—93—0510

Opinion filed August 25, 1994.

MAAG, J., specially concurring.
LEWIS, P.J., dissenting.

Karl D. Dexheimer and William J. Niehoff, both of Thompson & Mitchell, of Belleville, for appellant.

Lance Callis, of Callis, Papa, Hale, Jensen, Jackstadt, Bailey & Halloran, of Granite City, and Jeanne Sathre, of Edwardsville, for appellee.

JUSTICE WELCH delivered the opinion of the court:

On December 30, 1991, Alva R. Thomas (plaintiff) filed in the circuit court of Madison County a one-count complaint against his employer, the Norfolk & Western Railway Company (defendant), alleging a violation of the Federal Safety Appliance Act (Safety Appliance Act) (45 U.S.C.S. § 11 (Law. Co-op 1981 & Supp. 1994)). Specifically, plaintiff alleged that on August 23, 1991:

"[He] was working as a member of a switching crew located at Defendant's Coapman Yard, at or near East St. Louis, Illinois, when he was injured in whole or in part due to [defendant's] violation of the *** [Federal] Safety Appliance Act by failing to provide him with safe and suitable steps on one of Defendant's cabooses."

On February 18, 1992, defendant filed its answer. Following discovery, the case was tried from March 8, 1993, to March 11, 1993. First to testify in plaintiff's case in chief was Neal Hammack, defendant's claim agent, who investigated the accident. Hammack testified that defendant's inspection report concerning plaintiff's accident and, in addition, a report sent to management both noted the presence of oil on the caboose step involved.

Lance Johnston, conductor of the train on the night plaintiff was injured, testified, *inter alia*, that: after pulling into Coapman Yard in East St. Louis, he observed defendant sitting on the step of the caboose; defendant stated that he had injured his knee when he slipped off the caboose step; defendant was unable to walk; he observed oil on the bottom of plaintiff's boot; he and Ron Johnson, a train master from Granite City who arrived on the scene about 40 minutes after the accident, inspected the caboose; he observed footprints from one end of the caboose to the other where plaintiff had apparently been walking in oil; the footprints originated from the restroom; on the restroom floor was a spilled bottle of oil and some paper towels that had been placed on top of the spill; he did not know exactly how much spilled oil was on the restroom floor; and although he did not personally find any oil on the steps leading to the caboose, he would not disagree with the report stating that there was oil on the step in question.

Ron Johnson, a train master working for defendant, testified, *inter alia*, that: he investigated plaintiff's accident; while questioning plaintiff about the accident, he observed oil on the bottom of plaintiff's boot; when he asked plaintiff about the oil, plaintiff stated that he was unaware that he had oil on his boot; he saw oil footprints on the floor of the caboose; he found a puddle of oil on the restroom floor; the bottle containing the oil, which was clear and similar to a shampoo bottle, held approximately 12 ounces and was used to hold

samples of engine oil; there was no reason for such a bottle to be in a caboose; based on the investigation, he determined that plaintiff slipped on the step; and it was an unsafe and hazardous condition with oil on the floor and on the step.

In a video evidentiary deposition, Doctor Forbes McMullin, a board-certified orthopedic surgeon specializing in the knee and hip, testified, *inter alia*, that: he treated plaintiff; on January 9, 1992, he performed a second arthroscopic surgery on plaintiff's knee; on October 2, 1992, he performed reconstructive surgery on plaintiff's knee; he advised plaintiff not to return to work with the railroad but instead to find some work that would be less stressful on his knee; plaintiff's injury is permanent and disabling; plaintiff should refrain from activities that would place increased forces on his knee such as squatting, climbing, bending, walking on uneven terrain, or "any type of forceful activity in regard to his knee"; as to future medical treatment, plaintiff may require another arthroscopy or may need to have his kneecap removed or may require some type of prosthetic replacement; and plaintiff's injury is painful and will continue to be painful.

Plaintiff testified, *inter alia*, that: he began working for the defendant as a switchman at the beginning of 1991; as a switchman, he was required to walk on ballast (*i.e.*, the rock placed around the rails), climb to the top of railroad cars, kneel in order to connect air hoses under the cars, adjust draw bars (*i.e.*, steel bars used to couple cars together), and throw switches, which required one to bend down at the legs, grab the switch, and stand it up with one's legs; on August 23, 1991, he was working as a member of a night crew on a job to transfer a train from the A.O. Smith Yard located in Granite City to the Coapman Yard located in East St. Louis; sometime around 4:00 to 4:30 a.m., he boarded the caboose section of a train destined for Coapman Yard while the other members of his crew (*i.e.*, the conductor and engineer) rode in the engine; once on the caboose, he noticed the lights were not working; he proceeded to turn on his lantern, sit down at a table, and have a cup of coffee; during the approximately two-hour trip, he sat, "kind of watched and drank coffee," used the bathroom on the caboose two or three times, and also moved around in the caboose; when the train arrived at Coapman Yard just before daylight, he went to dismount the caboose to throw a switch; he dismounted the caboose, after it stopped, by backing down the steps while holding the railing on either side with his hands; when he put his right foot on the second step, it just slipped off "straight down to the ground," and when the foot hit, the knee twisted to the right; because he had a secure hold, he did not fall but

instead managed to pull himself up; when he slipped, he heard a pop and noticed that his knee started hurting "real bad"; when he looked at his knee, he saw that it was swollen and turning red; after seeking initial medical attention at Christian Northwest Hospital, he went and saw a specialist, Doctor Herbert Haupt, who performed an examination of the knee and took some X rays and some MRIs; Dr. Haupt later performed arthroscopic surgery; plaintiff was told not to work by all three doctors that he had seen (i.e., the doctor he saw at Christian Northwest Hospital, Doctor Haupt, and Doctor McMullin); he was a "sports nut" who engaged in many physical activities before the accident, such as softball, baseball, basketball, tennis, running, weight lifting, and water skiing; he used to bicycle and walk with his wife; defendant had offered him a choice of a janitorial position or a yard clerk position, but both jobs would require him to do things that his knee would not allow him to do (e.g., bend, kneel, or walk on ballast); he would start with zero seniority if he took either job, and there was no guarantee that the jobs would remain in St. Louis; his family and his wife's family lived in the St. Louis area; and his wife worked in St. Louis.

Finally, plaintiff testified in detail concerning: (1) the course of his treatment with both Doctors Haupt and McMullin; (2) his recovery and physical therapy; and (3) the pain he suffered as a result of the injury and the operations.

Doctor Leroy Grossman, a professor of economics at St. Louis University, provided testimony on plaintiff's damages. According to Doctor Grossman, plaintiff's past lost wages totaled $55,500, and his future lost wages, reduced to present value, totaled $932,602 if plaintiff worked until age 63. Thus, plaintiff's total damages for past and future wages were $988,102. If, however, plaintiff worked until age 67, his future lost wages would be $1,021,295. In that case, plaintiff's total damages, including the $55,500 past lost wages, were $1,076,795. These future lost-wage figures did not take into account plaintiff working a minimum wage job. If plaintiff worked a minimum wage job until age 63, his damages, including past lost wages of $55,500, totaled $765,286; but if he worked until age 67, his damages, including past lost wages, totaled $832,788. These damage calculations pertained only to plaintiff's economic losses and did not consider any noneconomic losses such as pain and suffering.

Doctor Samuel Bernstein, a licensed psychologist, vocational expert, and the chief executive officer of the Metropolitan Employment and Rehabilitation Service (a rehabilitation agency), testified that: he evaluated plaintiff's medical, educational, and employment background; he evaluated plaintiff's psychological condition and

administered some tests; based on his examination, he concluded that while plaintiff could not return to work for the railroad, he could perhaps get back into the security field; plaintiff, with his disability, and without training or skills, would be "very limited" in the labor market; plaintiff could, with some difficulty, obtain an associate degree in the corrections or security field; it was unlikely that plaintiff could go beyond the associate degree level; and with such a degree, plaintiff would earn about $4.50 to $6 an hour.

At the close of plaintiff's case in chief, defendant moved for a directed verdict. The trial court denied defendant's motion. Defendant then proceeded with its case in chief.

James M. England, Jr., a rehabilitation counsellor, testified that: plaintiff would be able work in the mail sorting, copying, or security fields, which he had done in the past; based on his conversations with the railroad, plaintiff could work as a clerk with physical restrictions; and if plaintiff earned an associate degree in a field such as security, medical terminology, medical lab technician, drafting, or data processing, he could earn $10 an hour as a starting wage.

Also testifying for defendant were Richard S. Hayth, defendant's assistant manager for disability and support services; Charles Wagoner, a terminal control agent for defendant in St. Louis; and Fred Williams, superintendent of terminals for defendant in St. Louis. Both Hayth and Wagoner testified about the possibility of plaintiff working, in some capacity, for defendant. Williams' testimony concerned the earning potential of plaintiff and other similarly situated railroad employees. Lastly, the evidentiary deposition of Doctor Herbert Haupt was read into evidence. Essentially, this testimony concerned the possibility that plaintiff may have had some preexisting knee injury.

At the close of all the evidence, the trial court took judicial notice of 49 C.F.R. § 231.10(i) (1991), which governs caboose-platform steps. This regulation provides: "[S]afe and suitable box steps leading to caboose platforms shall be provided at each corner of caboose. Lower tread of step shall not be more than 24 inches above top of rail." (49 C.F.R. § 231.10(i) (1991).) Plaintiff then moved for a directed verdict on the issue of liability, which the trial court granted. The jury returned a verdict in favor of plaintiff in the amount of $1,255,500, itemized as follows:

(1) aggravation of preexisting ailment/condition .. $ 0
(2) disability and disfigurement ................... $250,000
(3) past and future pain and suffering ............. $500,000
(4) past lost wages ................................ $ 55,500
(5) future lost wages .............................. $450,000.

On April 8, 1993, defendant filed an extensive post-trial motion and supporting memorandum. On June 16, 1993, plaintiff filed a memorandum in opposition to defendant's post-trial motion. Also on June 16, 1993, a hearing was held on the post-trial motion. On June 25, 1993, defendant filed a reply. On June 30, 1993, the trial court entered an order denying the post-trial motion.

On appeal, defendant contends that: (1) plaintiff failed to prove the elements necessary to sustain his only cause of action for an alleged violation of the Safety Appliance Act; (2) the trial court erred in refusing to enter an order scheduling expert discovery, erred in denying the defendant's motion for a continuance, and erred in permitting plaintiff's expert witness to testify; (3) the trial court erred in ruling on certain objections to evidence and in instructing the jury; (4) the trial court erred in failing to grant defendant's motion for a mistrial when plaintiff's counsel, in a tone of voice clearly audible to the jury, twice falsely and profanely accused a witness of lying during his testimony; and (5) the verdict was grossly excessive and was the result of passion, prejudice, and legal error.

## I. SAFETY APPLIANCE ACT

The Safety Appliance Act provides:

> "[I]t shall be unlawful for any common carrier subject to the provisions of this Act *** to haul, or permit to be hauled or used on its line, any car subject to the provisions of this Act *** not equipped with appliances after July first, nineteen hundred and eleven, provided for in this Act ***, to wit: All cars must be equipped with secure still steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the tops of such ladders ***." 45 U.S.C.S. § 11 (Law. Co-op 1981 & Supp. 1994).

We begin from the premise stated in *Lilly v. Grand Trunk Western R.R. Co.* (1943), 317 U.S. 481, 486, 87 L. Ed. 411, 415, 63 S. Ct. 347, 351, that the Safety Appliance Act "is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safety equipment." (See also *Knight v. Chicago & North Western Ry. Co.* (1954), 3 Ill. App. 2d 502, 508, 123 N.E.2d 128, 132.) Over time, an extensive collection of safety regulations has been built up under the Safety Appliance Act. (See 49 C.F.R. § 231.10 *et seq.* (1991).) One such regulation is 49 C.F.R. § 231.10(i) (1991), which mandates that "safe and suitable" caboose-platform steps shall be provided.

In arguing that no violation of the Safety Appliance Act can ever be based upon the presence of a foreign substance on a safety appliance, defendant overlooks the specific "safe and suitable" requirement imposed on railroads under 49 C.F.R. § 231.10(i) (1991). To support its position, defendant cites a plethora of cases involving safety appliances other than caboose-platform steps. (See, *e.g.*, *Sheehy v. Southern Pacific Transportation Co.* (9th Cir. 1980), 631 F.2d 649 (sill steps); *Collins v. Southern Pacific Co.* (9th Cir. 1961), 286 F.2d 813 (grab iron); *Raudenbush v. Baltimore & O.R. Co.* (3d Cir. 1947), 160 F.2d 363 (sill steps); *Ford v. New York, N.H. & H.R. Co.* (2d Cir. 1931), 54 F.2d 342 (handhold); *Allen v. Union R.R. Co.* (W.D. Pa. 1958), 162 F. Supp. 635 (sill steps). *Cf. Knight v. Chicago & North Western Ry. Co.* (1954), 3 Ill. App. 2d 502, 123 N.E.2d 128 (caboose-platform steps).) What separates these cases from the instant case is that sill steps, grab irons, and handholds are not governed by the regulation pertaining to caboose-platform steps. In other words, defendant's reliance on the cases cited above is misplaced because it ignores the controlling "safe and suitable" requirement of the regulation regarding caboose-platform steps.

Additionally, the regulation at issue in this case is far broader than the regulations applying to sill steps and grab irons. For instance, the regulation concerning sill steps requires the following:

"(2) *Dimensions.* Minimum cross-sectional area $1/2$ by $1^1/2$ inches, or equivalent, of wrought iron or steel. Minimum length of tread, 10, preferably 12, inches. Minimum clear depth, 8 inches.

(3) *Location.* (i) One near each end of each side of car, so that there shall be not more than 18 inches from end of car to center of tread of sill step.

(ii) Outside edge of tread of step shall be not more than 4 inches inside of face of side of car, preferably flush with side of car.

(iii) Tread shall be not more than 24, preferably not more than 22, inches above the top of rail.

(iv) Carriers are not required to change location of sill steps on cars in service July 1, 1911, where the appliances are within 3 inches of the required location, except that when cars undergo regular repairs they must then be made to comply with the standards prescribed.

(4) *Manner of application.* (i) Sill steps exceeding 21 inches in depth shall have an additional tread.

(ii) Sill steps shall be securely fastened with not less than $1/2$-inch bolts with nuts outside (when possible) and riveted over, or with not less than $1/2$-inch rivets." 49 C.F.R. § 231.1(d) (1991).

As is evident, the regulation concerning sill steps is confined to specific construction and design requirements. A review of the various regulations governing safety appliances other than caboose-platform

steps reveals that most of those regulations are likewise narrowly drawn to deal with design and construction requirements. In contrast, caboose-platform steps are broadly regulated in nonspecific and non-technical terms. The sill-step regulation does not contain any language comparable to the "safe and suitable" requirement that governs caboose-platform steps. Consequently, we find that the cases cited by defendant involving sill steps are inapplicable to the instant case.

The "safe and suitable" language contained in the caboose-platform regulation is similar to the "safe to operate" language found in the Boiler Inspection Act (Boiler Act) (45 U.S.C.S. § 23 (Law. Co-op 1981 & Supp. 1994)). It is, therefore, instructive to examine how the safety requirement of the Boiler Act has been interpreted. In *Calabritto v. New York, New Haven & Hartford R.R. Co.* (2d Cir. 1961), 287 F.2d 394, 395, defendant made the argument that the Boiler Act imposes liability only for mechanical and structural defects, and not for dangerous conditions caused by the temporary presence of foreign matter. The court rejected that argument, stating "the statute itself contains no such limitation, and instead requires all locomotives and their parts and appurtenances to be 'in proper condition and safe to operate *** without unnecessary peril to life or limb.' " (*Calabritto*, 287 F.2d at 395.) Similarly, we point out that the caboose-platform-step regulation contains no limitation regarding foreign substances, and we decline to read such a limitation into the regulation.

Because the Federal Railroad Administration has chosen to regulate caboose-platform steps in broad terms similar to those found in the Boiler Act, it is appropriate to look at cases decided under the Boiler Act in determining whether the regulation for caboose-platform steps gives rise to liability for foreign substances on those steps. It has been consistently held that a foreign substance is an unsafe condition giving rise to liability. See, *e.g.*, *Bankston v. Chesapeake & Ohio Ry. Co.* (1984), 128 Ill. App. 3d 166, 470 N.E.2d 512 (oil on locomotive's exterior catwalk); *St. Louis Southwestern Ry. Co. v. Williams* (5th Cir. 1968), 397 F.2d 147 (oil on engine step); *Calabritto*, 287 F.2d 394 (sand and oil on engine platform).

We need not look solely at cases arising under the Boiler Act to find support for our position. In *Missouri Pacific R.R. Co. v. Ramirez* (Tex. Civ. App. 1959), 326 S.W.2d 50, 53, a case involving the caboose-platform-step regulation at issue in this case, it was held that evidence of a caboose-platform step being "slick" was sufficient to support a finding that the step was not safe and suitable. We agree with plaintiff that it should make no difference whether the slickness is caused by oil or by a permanent condition of the surface. Certainly,

there is nothing in the caboose-platform-step regulation differentiating between slickness due to wear and slickness resulting from the presence of oil.

For the aforementioned reasons, we hereby affirm the judgment entered by the circuit court of Madison County.

Affirmed.

JUSTICE MAAG, specially concurring:

I concur in Justice Welch's opinion. I write separately to address the dissent filed by Justice Lewis.

The dissent opines that the word "safe" in 49 C.F.R. § 231.10(i) (1991) is a creature of nothing more than a "safety regulation" and that the regulatory body does not "have the power" to make the regulation broader than the wording and intent of the statute. He eloquently quotes from the Latin and laments that the "impossible" is being asked. To all this I must say that Washington, D.C., is lovely in the spring, and if elected to the United States House of Representatives or the United States Senate, he could introduce and possibly have passed legislation that would change the law to conform to his sensibilities. Until that occurs however, he is wrong on the law.

As to his complaint that conformity to the regulation is impossible, I urge him to read *Payne v. Colvin* (7th Cir. 1921), 276 F. 15, 17, which held: "If the statute is harsh and is difficult to comply with, relief must come from the lawmaking, not the judicial, branch of the government" (referring to the Safety Appliance Act and the railroad's claim that compliance was impossible).

Addressing the claim that the regulation expands the requirements of the Act, the dissent is simply wrong. Section 12 of the Safety Appliance Act (45 U.S.C.S. § 12 (Law. Co-op 1981 & Supp. 1994)) specifically provides the authority for promulgating regulations of the type at issue. Regulations passed pursuant to this statutory authority carry the force of law and receive the same treatment as if written in the statute. *Atchison, Topeka & Santa Fe Ry. Co. v. Scarlett* (1937), 300 U.S. 471, 81 L. Ed. 748, 57 S. Ct. 541; *United States v. Missouri-Kansas-Texas R.R. Co.* (10th Cir. 1959), 273 F.2d 474; *Williams v. New York Central R.R. Co.* (1949), 402 Ill. 494, 84 N.E.2d 399.

Even in *Knight v. Chicago & North Western Ry. Co.* (1954), 3 Ill. App. 2d 502, 123 N.E.2d 128, cited by the dissent, the word "secure" in the statute was construed to encompass "safe." As to the claim that no case can be cited where the regulation was applied to a foreign substance on steps, the dissent should read *Knight* again. In

that case it was undisputed the step was wet and the plaintiff admitted having cinders on the soles of his boots. *Knight*, 3 Ill. App. 2d at 506-07, 123 N.E.2d at 131.

Violation of the Safety Appliance Act is a breach of an absolute duty imposed by statute, rather than a claim based on negligence, and liability cannot be avoided by a showing of care. *(Colorado Milling & Elevator Co. v. Terminal R.R. Association* (8th Cir. 1965), 350 F.2d 273; *Williams*, 402 Ill. at 501-02, 84 N.E.2d at 403.) The statute is mandatory and includes not only initial equipping but also maintenance. *Anderson v. Chesapeake & Ohio Ry. Co.* (1933), 352 Ill. 561, 564, 186 N.E. 185, 186.

The dissent focuses on the use of the word "safe" in the Boiler Inspection Act (45 U.S.C.S. § 23 (Law. Co-op 1981 & Supp. 1994)) as distinguished from the use of the word "secure" in section 11 of the Safety Appliance Act. The dissent is troubled because the word "safe" only appears in a regulation. What difference does that make? The United States Supreme Court, the Federal courts of appeal, and our own State supreme court have held that these regulations carry the force of law and are to be treated like they were integral parts of the statute.

Even after the United States Supreme Court decided *Lilly*, railroads continued to argue that the word "safe" in the Boiler Inspection Act referred only to mechanical defects that rendered the equipment unsafe; and railroads cited early cases that held foreign substances on steps did not constitute unsafe conditions as contemplated by that Act. These claims were decisively rejected:

> "In determining whether the jury could properly find that the presence of oil on the step of the locomotive constituted a violation of [section 23 of the Boiler Inspection Act], the construction and meaning of the Supreme Court's decision in *Lilly v. Grand Trunk Western R. Co.*, 1943, 317 U.S. 481, 63 S. Ct. 347, 87 L. Ed. 411, is crucial. Prior to that decision, the cases of *Ford v. New York, N.H. & H.R. Co.*, 2nd Cir. 1931, 54 F.2d 342, and *Reeves v. Chicago, St.P., M. & O. Ry. Co.*, Minn. 1920, 147 Minn. 114, 179 N.W. 689, were clearly in favor of the defendant's position. Those cases were considered by the Supreme Court in *Lilly*, supra, but the defendant urges that, instead of disapproving the holdings as no longer the law, the Supreme Court distinguished them solely on the basis that they did not involve a violation of an applicable regulation of the Interstate Commerce Commission. The Court's language, in our opinion, shows that it not only distinguished the *Ford* and *Reeves* cases, but that it also disapproved their holdings.
>
> 'From various cases denying recovery under the Act, respondent attempts to extract a general rule that the Act

covers only defects in construction or mechanical operation and affords no protection against the presence of dangerous objects or foreign matter. But there is no warrant in the language of the Act for construing it so narrowly, or for denying the Commission power to remedy shortcomings, other than purely mechanical defects, which may make operation unsafe. The Act without limitation speaks of equipment 'in proper condition and safe to operate * * * without unnecessary peril to life or limb.' Conditions other than mechanical imperfections can plainly render equipment unsafe to operate without unnecessary peril to life or limb. Whatever else may be said about the cases relied upon by respondent, they are sufficiently distinguishable in that they either did not involve or did not consider Rule 153 or any comparable regulation.'" *St. Louis Southwestern Ry. Co. v. Williams* (5th Cir. 1968), 397 F.2d 147, 149-50, quoting *Lilly*, 317 U.S. at 487-88, 87 L. Ed. at 416, 63 S. Ct. at 352.

Section 23 of the Boiler Inspection Act makes two distinct acts unlawful: first, using any covered equipment that is not "safe to operate"; second, using any covered equipment that has not been inspected.

The Safety Appliance Act does not require inspections, but 49 C.F.R. § 231.10(i) (1991) requires the covered equipment to be "safe." "Safe" under the Boiler Inspection Act and the Safety Appliance Act (and accompanying regulations) should be given the same meaning.

Therefore, I concur in Justice Welch's opinion.

PRESIDING JUSTICE LEWIS, respectfully dissenting:

The problem with plaintiff's suit is that the Safety Appliance Act (45 U.S.C.A. § 11 (West 1986 & Supp. 1994)) does not apply to the facts in the case at bar. Section 11 says: "[I]t shall be unlawful for any railroad *** to haul, or permit to be *** used on its line, any car *** not equipped with appliances ***, to wit: All cars must be equipped with secure sill steps ***." (45 U.S.C.A. § 11 (West Supp. 1994).) Section 11 does not say that it is unlawful for any railroad to haul or use any car not equipped with accident-proof sill steps. *Lex non intendit aliquid impossibile, i.e.,* the law does not intend anything impossible.

There was no allegation that the steps were unsecured or even unsafe in any way. Thus, the railroad met its duty to equip the car in question with secure steps and, even, "safe" steps. It is only when a foreign substance is added does a question arise. Was it the steps, or was it the oil, or was it the heavy dew that fell that morning, according to the defendant, or was it simply that the plaintiff was

100% careless or negligent and would have fallen even if he were standing on the flat pavement, that caused the accident?

Take the example of the ubiquitous banana peeling. Is it not the banana peeling that causes a person to slip and fall, rather than the ground underneath the peeling? In the case at bar, no one argues that the steps without the oil or dew could have caused the injury. If the plaintiff had slipped on grass due to the oil on his shoe, would we blame God?

The Act itself says nothing about the steps being "safe." It speaks only of the cars being equipped with secure sill steps. The majority points out that the word "safe" arises solely from a safety regulation drafted by the Federal Railroad Commission and that it "decline[s] to read such a limitation [an exception for the temporary presence of foreign matter] into the *regulation.*" (Emphasis added.) (266 Ill. App. 3d at 510; 49 C.F.R. § 231.10(i) (1991).) However, the majority is reading an addition, the words "safe from all foreign matter or safe in all ways, times, or places," into the regulation and the statute. Surely, the drafters of the regulation did not intend, nor do they have the power, to make the regulation broader than the intent of the statute. (See *Knight v. Chicago & North Western Ry. Co.* (1954), 3 Ill. App. 2d 502, 123 N.E.2d 128.) Nor can anyone cite a situation where the regulation was applied to a foreign substance on the steps.

Contrary to the concurring opinion, a close reading of the *Knight* case shows that the appellate court ruled that the issue of whether worn wooden steps with the edges rounded off, as opposed to steel perforated steps, were a violation of the Safety Appliance Act was to be decided by a jury. Wet steps and cinders on plaintiff's shoes were only mentioned in passing by the court as being admissions by the plaintiff. Since the court totally ignored such admissions by the plaintiff in its opinion and discussion of the law and the facts, except for briefly mentioning that the railroad said that wood and steel were equal in adherence when wet, I received the impression that the court would have dismissed the case as a matter of law, if the car had been equipped with secure, steel, perforated steps. *Knight*, 3 Ill. App. 2d at 507-11, 123 N.E.2d at 132-33.

The majority cites and analogizes from the holdings in *Lilly v. Grand Trunk Western R.R. Co.* (1943), 317 U.S. 481, 87 L. Ed. 411, 63 S. Ct. 347, and *Calabritto v. New York, New Haven & Hartford R.R. Co.* (2d Cir. 1961), 287 F.2d 394, which cases are concerned with an interpretation of the Boiler Inspection Act (Boiler Act) (45 U.S.C.A. § 23 (West 1986 & Supp. 1994)). These cases provide good examples of the point I am attempting to make. The Boiler Act itself, and not a regulation, requires in part:

"It shall be unlawful for any railroad to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time ***." (45 U.S.C.A. § 23 (West 1986).)

Clearly, the "Boiler Act" by its very wording mandates inspections and that the tender must be safe and in proper condition before being used. Section 11 of the Safety Appliance Act does not mandate inspections or prohibit the use of steps when wet or slick, most likely because Congress believed that everyone using such familiar objects, such as steps, knows to be careful, especially when wet.

A person or corporation should not be held civilly liable, let alone liable for fines under section 13 of the Safety Appliance Act (45 U.S.C.A. § 13 (West 1986 & Supp. 1994)), unless he, she, or it has done something wrong or failed to perform a duty required by law. If the railroad failed to attach steps securely to the car or did not maintain such to stay secured, then clearly the railroad would have violated the law. How can we, however, stretch the plain meaning of the words "equipped with secured steps" to mean "equipped with secured steps that will repel all foreign substances"? In this case, the steps could have been inspected a million times and the accident could not have been prevented. Moreover, it would be ridiculous to require in effect that the railroads shut down every time it snowed, sleeted, or rained or a heavy dew fell, so that all car steps would be "safe," when used.

If Congress desires to impose liability for any and all possible accidents that happen to occur on the steps, then Congress should say so. The wording of statutes, however, should be given their ordinary meaning and not be rewritten by the courts to cover situations not intended by Congress. It would be useless for me to go to Washington, if the courts are going to change the plain meaning of the statute by judicial legislation in order to avoid the contributory negligence issue present under the Federal Employer's Liability Act.

The only case involving a slip and fall under section 11 due directly to a foreign substance on the sill step, and not a defective step as in *Knight*, is *Raudenbush v. Baltimore & O.R. Co.* (3d Cir. 1947), 160 F.2d 363. (See also *Ford v. New York, N.H. & H.R. Co.* (2d Cir. 1931), 54 F.2d 342 (where grease on the handhold was held not to

be a violation of section 11); *Tobin v. Detroit, T. & I.R. Co.* (1937), 57 Ohio App. 306, 13 N.E.2d 739 (where frost on the running board on a tank car was not a violation of section 11).) In *Raudenbush*, there may have been snow on the sill step. The court of appeals held that it would be an impossible duty to require the railroad to keep the snow off the steps at all times. The court also alluded that section 11 referred only to defects in the mechanical and structural character of the steps. The court then held that there was no duty upon the railroad to remove the snow and thus there was no violation of section 11 of the Safety Appliance Act. I do not see where I am wrong about the law under section 11 of Safety Appliance Act, as no cases hold that the Boiler Inspection Act applies to section 11.

Can we say as a matter of law that the steps caused the accident? Surely, a directed verdict against the defendant as to liability should not have been entered. At a minimum, the jury, as in *Knight*, should have been permitted to decide if the defendant violated the Federal law.

Accordingly, I would remand for a new trial under the Federal Employer's Liability Act, which provides the remedy for plaintiff intended by Congress.